[No. S004718. Nov. 26, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
HORACE EDWARDS KELLY, Defendant and Appellant.

COUNSEL

Harvey Zall and Fern M. Laetham, State Public Defenders, under appointment by the Supreme Court, Edward H. Schulman, Chief Deputy State Public Defender, Richard Avila and Sandra Goldsmith, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney

General, Jay M. Bloom and Rudolf Corona, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ARABIAN, J.**—This is an automatic appeal from a judgment of death. Defendant Horace Edwards Kelly was found guilty of one count of first degree murder (Pen. Code, § 187);[1] the jury also found to be true two special circumstance allegations that the murder was committed during the commission or attempted commission of a kidnapping (§ 190.2, subd. (a)(17)(ii)), as well as an allegation that defendant used a firearm in the commission of the murder (§ 12022.5).

### FACTS

I. *Guilt Phase Evidence*

On November 22, 1984, Thanksgiving Day, 11-year-old Danny O. was shot and killed in the County of Riverside. The events leading up to this tragedy were as follows: On the date in question, Danny and his family were visiting relatives in Riverside for the traditional Thanksgiving dinner. An hour or two after the families finished dinner, Danny and his 13-year-old cousin, Shannon P., decided to walk to a convenience store in a nearby shopping center to buy candy. It was dark when the two children left the house.

After their purchase, Danny and Shannon proceeded to walk home. Their route took them through a 7-Eleven parking lot and onto a dirt path adjacent to Limonite Avenue. As they approached a rise, they saw a man walking toward them from the opposite direction. As the man passed, Shannon noted that he was dressed "in a sort of ranger uniform," "like a cop." The children began to walk faster because, as Shannon recalled, the man "looked weird like he was up to something."

The next thing Shannon remembered was Danny telling her to run. Danny ran down the path and Shannon followed. She looked back and saw that the man was pursuing them. As she ran, she noticed a van parked on the side of the road facing traffic. The van's engine was running. She noted that it had distinctive stripes on the side.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

The man caught Shannon from behind, grabbing her around the neck with his arm. She felt something hard at her side, looked down and saw that it was a pistol. Danny, in the meantime, had run into the middle of the street and was waving his arms and yelling "stop" in an effort to flag down a passing car for assistance. The man told Shannon to "get [her] brother over to where" she was. Shannon called out to Danny. As she did so, the man placed the gun against her neck and began to drag her toward the van. Shannon tried to resist by digging her heels into the ground, but to no avail. They moved closer to the van.

As Danny approached he asked the man why he was doing this. The man told him to "shut up." Shannon asked him, "Do you want any money?" The man replied, "No, I don't want your money. Just shut the hell up." He continued to drag and pull Shannon closer to the van. Just then, Danny kicked the man, enabling Shannon to drop down and escape from his grasp. She ran perhaps 40 feet and started to climb a brick wall. As she reached the top, she looked back and saw a flash and heard a gunshot. She jumped off the wall and heard another shot. There was a pause. Then she heard Danny say, "Don't shoot me again. I'll die this way." A third shot registered. Shannon ran and eventually obtained assistance at a nearby house.

Shortly after 6 p.m. on the same evening, Virgil Hayden, who lived on a street parallel to Limonite Avenue, stepped outside of his house for a cigarette and saw a van pull up across the street. It had large exhaust pipes and a distinctive red stripe. Mr. Hayden noticed that the driver had his head cocked toward the side mirror, as though he was looking to the rear of the vehicle. After a few minutes, he saw the driver get out of the van and run back toward the 7-Eleven. Mr. Hayden returned to his house and, after several minutes, heard three noises like the sound of a car backfiring. When he went back outside, the van was gone.

A short time later, Danny's body was discovered by a passing motorist on Limonite Avenue. The body was in the middle of the street, lying on its back, arms outstretched. The body was still warm but did not respond to CPR. There was a bullet hole between the eyes. The victim was taken to a hospital, but was pronounced dead on arrival.

Later that evening, Shannon provided the police with a detailed description of her assailant and his distinctive van. About 10 p.m., a deputy sheriff spotted the vehicle and radioed another officer, Detective Cornejo, who was at the crime scene with Shannon and her parents. Detective Cornejo took Shannon to a point where she could observe the van as it drove by; she identified it as the vehicle involved in the assault earlier that evening. The van was immediately stopped and Shannon identified the driver, defendant,

as her assailant. Defendant was wearing a tan shirt with a badge and security guard patches on the sleeves. He was also wearing leather gear and a baton. A search yielded eight rounds of .357 magnum ammunition in defendant's trouser pocket.

Defendant was transported to the Riverside County Sheriff's Department for booking and interrogation. (The facts of the interrogation will be set forth separately below.) A subsequent search of the van revealed a tool box containing a blue steel .357 magnum caliber pistol, 12 live .357 magnum rounds and dozens of expended .357 magnum casings. Forensic tests on two bullets found at the crime scene showed conclusively that they had been fired from defendant's gun. Blood on the barrel of the gun was consistent with Danny's blood and inconsistent with that of defendant. Gunshot residue was found on defendant's hands.

An autopsy revealed two bullet wounds to the victim; the first shot entered the right side of the boy's chest and exited through the back; the second entered between the eyes and exited through the left side of the brain. The primary cause of death was the bullet which passed through the brain. Gunshot powder burns and residue on the victim indicated that the gun was four to six inches from the boy when the shot was fired between his eyes.

The gun used to kill Danny O. had been purchased from a gun shop in San Bernardino two months earlier. The dealer's record of sale indicated that it had been sold to defendant.

II. *Penalty Phase Evidence*

A. *Prosecution Evidence*

The prosecution presented evidence of two prior instances of criminal activity involving defendant's use of force or violence. (§ 190.3, factor (b).) Both related to homicides in San Bernardino that had occurred one week before the murder of Danny O. Early on the morning of November 16, 1984, between 4 and 5 a.m., Ms. Sonia Reed was dropped off by an acquaintance in an area of San Bernardino called Waterman Gardens, near defendant's place of residence. Ms. Reed had a history of drug use and had smoked cocaine earlier that morning. She had once been arrested for soliciting an act of prostitution.

About 5 that morning, Mrs. Irene Gamboa, who lived at 10th Street and Waterman Avenue, was awakened by a muffled banging sound. Several minutes later she heard someone say, "Oh, God," and then a minute or two

later she heard another bang. Later that morning, the body of Sonia Reed was discovered behind a headstone at a nearby memorial business. The body was nude from the waist down. An autopsy revealed two contact gunshot wounds; the first shot entered the victim through the back, the other through the back of the neck; the latter wound was inflicted while the barrel of the gun was pressed against the victim's head. Forensic tests established that the bullets which killed her were fired from defendant's .357 magnum pistol.

The next morning, November 17, 1984, the body of another woman, Ursula Houser, was discovered in an alleyway near Highland Avenue and D Street in San Bernardino. The victim's skirt had been pulled up above her waist and her panties and pantyhose had been ripped off. The body appeared to have been dragged some distance. An autopsy revealed a contact gunshot wound similar to that inflicted on Ms. Reed. The bullet entered through the back of the head and traveled through the brain, causing instant death. Forensic tests definitively established that the bullet which killed Ms. Houser had been fired from the .357 magnum pistol recovered from defendant's van.

### B. *Defense Evidence*

Defendant called numerous witnesses in mitigation. Several family members, friends and school officials were called to testify to defendant's poor and abused childhood. Margaret Carter, a friend of defendant's family for over 40 years, described defendant's father as "brutal" and "dominating." The father died when defendant was nine, and thereafter defendant worked at various odd jobs to help support the family. She described defendant as shy and introspective. Several family members, including defendant's mother, also recalled that defendant was abused and terrorized by his father. Many expressed shock over defendant's actions, which they believed were inconsistent with his personality. They consistently described defendant as unusually subservient to authority and educationally retarded.

Two school psychologists, a learning disability specialist and a social worker presented testimony concerning defendant's performance in high school. Their tests and observations from that period of time indicated that defendant had serious learning disabilities or perceptual impairments, that he functioned at the level of a fourth or fifth grader, and that his overall IQ measured 81, considered low average to borderline. The school officials also noted that defendant had been born prematurely, that his development as an infant was delayed, and that his learning disabilities limited his social interaction in school and caused him frustration and loss of self-esteem.

Several witnesses, including defendant's wife and mother, testified that defendant suffered from chronic headaches. Two dentists who examined defendant following his arrest attributed the headaches to a structural problem in the joint which hinges the jaw bone.

Finally, defendant presented the testimony of a number of expert medical witnesses. Dr. Hunt, a neurologist, presented the results of a series of neurological tests administered to defendant; these included a CAT-scan and an electroencephalogram (EEG) to test brain functioning. The EEG was within normal limits; the CAT-scan revealed evidence of brain atrophy in the upper and temporal frontal lobes. Dr. Hunt explained, however, that psychological dysfunction and the effects, if any, of organic brain damage on behavior could not be determined from the CAT-scan results: "[Y]ou can have damage that is quite bad and the patient still not have any obvious trouble . . . ."

In addition, Dr. Kanzler, a clinical neuropsychologist, presented the results of a battery of tests he administered to defendant. His findings indicated that defendant had an overall IQ of 84, considered to be in the borderline/dull normal range, as well as cerebral "deficits" consisting of impaired memory and attention, and deficient "cognitive flexibility." Dr. Kanzler concluded these deficits were "compatible with . . . brain dysfunctions," but noted there was no necessary correlation between brain damage and cognitive dysfunction.

Finally, Dr. Hoyle, a clinical psychologist, presented testimony based upon his one interview with defendant and a review of defendant's school and medical records. Dr. Hoyle administered a standard MMPI (Minnesota Multiphasic Personality Test) and characterized defendant as a "schyzotypal" personality, exhibiting symptoms of social isolation and occasional bizarre or strange thoughts, but not psychosis. He also concluded defendant had an attention-deficit disorder, characterized by symptoms of impulsiveness, difficulty in sleeping and distractibility. Defendant's cognitive symptoms were consistent, in Dr. Hoyle's view, with the neurological tests revealing organic brain damage or atrophy.

DISCUSSION

I. *Guilt Phase Issues*

A. *Denial of Motion to Suppress*

Defendant's principal claim of error concerns the introduction at trial of a taped confession to the police. ■■ ■■ ■■ Defendant contends the

use of this evidence was reversible per se because the confession was the product of multiple *Miranda* (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) violations and impermissibly coercive police tactics.[2] As explained below, we conclude the contention lacks merit.

### 1. *Facts*

As noted earlier, defendant's van was identified and defendant was placed under arrest within hours of the shooting. He was searched and transported to the Riverside County Sheriff's Department, where a blood sample was taken and his clothes were seized and replaced with a jail jump suit. He was then moved to a detective's office for interrogation. No questioning of defendant took place during this time.

The interrogation of defendant commenced at 11:27 p.m. and was tape-recorded. Present at the interrogation were Detectives Cornejo and Ferguson. Defendant was informed that the officers were investigating the homicide of an 11-year-old boy and that he was suspected of having committed the offense. The officers then read defendant his rights, he waived them, and in response to close questioning steadfastly denied any involvement in the crime. He explained that he had left the job site where he worked as a security guard at approximately 10 p.m. that evening, drove his van to a 7-Eleven store for a cup of coffee and returned to his job site. Defendant repeatedly denied stopping the van at any other time or place, denied seeing two children walking by the side of the road, denied accosting the girl and denied shooting the boy. Defendant stated that he did not drink or take drugs. He admitted that he owned a .357 magnum pistol which he kept in the back of the van but denied that he had fired the gun that day.

At 12:05 a.m, after about 30 minutes of questioning, the officers interrupted the interrogation to have certain additional photographs taken of defendant. Defendant had stated that a bloodstain on his upper leg was the result of a scratch; the photos were to document that no cut was present. The interrogation resumed half an hour later, at 12:38 a.m. Detective Cor-

---

[2] The People argue that we should treat the statement as an admission rather than a confession in the event we determine it was inadmissible under *Miranda*, thereby invoking a reasonable doubt rather than a reversal per se standard. (*People* v. *Murtishaw* (1981) 29 Cal.3d 733, 756 [175 Cal.Rptr. 738, 631 P.2d 446]; *People* v. *McClary* (1977) 20 Cal.3d 218, 230 [142 Cal.Rptr. 163, 571 P.2d 620].) As will appear, however, defendant's statement clearly qualifies as a confession and we shall treat it as such. (See *People* v. *Murtishaw, supra*, 29 Cal.3d at p. 756 [A confession is a declaration of the defendant's intentional participation in a criminal act and must include all elements of the crime.].) We need not consider the applicable standard of prejudice in this case, however, inasmuch as we conclude the statement was properly admitted at trial.

nejo asked if defendant remembered the admonitions that were read to him earlier. Defendant stated that he did. The detective then asked whether, having those rights in mind, defendant wished to continue to talk to them. Defendant responded, "I'll talk."[3]

In a somewhat disjointed narrative, defendant proceeded to explain the events of the prior evening. He stated that he suffered from frequent, severely painful headaches and explained that he had experienced such a headache that day. After leaving the job site, he found himself with a gun in his hand and recalled firing "[p]robably one, two or three times." He stated: "I think the boy ran and I fired shots at him." He remembered that the boy had his hands in front of him as he lay on the ground. He couldn't remember why he fired. He recalled that he told the girl to get in the van because he wanted to take her home; he denied any intent to rape. He stated that he was sorry for what he had done, and cried several times during the questioning.

Defendant also acknowledged that he was wearing his security guard uniform when he accosted the children, and that his shirt contained both a badge and patches on the sleeves.

An hour later, at 1:42 a.m., the officers stopped the interview to allow defendant to call his wife and to drive defendant to the scene of the shooting. Defendant's remarks at the crime scene were not recorded. Detective Cornejo testified, however, that defendant told him he pulled his van over to the side of the road when he saw the children walking on the shoulder, exited the van and proceeded to walk back toward them. Defendant initially thought both children were girls. When he realized his mistake, he grabbed the girl, put a gun to her head and started to drag her to the van. He intended to rape the girl. When the boy ran into the street he shot him. When the boy fell, "I shot, I missed, and I shot again and I got him."

Following their visit to the crime scene, the officers and defendant returned to the station house for a third and final interrogation session. In response to somewhat leading questions, defendant essentially repeated the story he had told at the scene of the shooting. The interrogation ended shortly thereafter.

---

[3] The colloquy preceding the resumption of defendant's interrogation consisted of the following: Detective Cornejo: "Remember your admonishments. Do you still remember your admonishment?"
Kelly: "Who?"
Cornejo: "Remember I read you your rights?"
Kelly: "Yeah."
Cornejo: "Having those rights in mind, do you still want to talk to us?"
Kelly: "I'll talk."

Prior to trial, defendant moved to suppress the taped statement on the grounds that the *Miranda* warnings he was given were defective and that his confession was the product of coercive police tactics. The trial court denied the motion, ruling that defendant was properly advised of his rights, and finding that defendant's waiver and confession were voluntary beyond a reasonable doubt.

### 2. *Discussion*

As noted above, defendant contends the trial court's ruling was erroneous. His argument here, as below, is essentially twofold: First, he asserts that the *Miranda* warnings given by the officers were inadequate and misleading; second, he claims that his waiver of *Miranda* rights and subsequent confession were involuntary. We assess each contention in light of the following common principles.

In considering a claim that a statement or confession is inadmissible because it was obtained in violation of a defendant's rights under *Miranda* v. *Arizona, supra,* 384 U.S. 436, we accept the trial court's resolution of disputed facts and inferences, and its evaluation of credibility, if supported by substantial evidence. (*People* v. *Boyer* (1989) 48 Cal.3d 247, 263 [256 Cal.Rptr. 96, 768 P.2d 610].) Although this court must independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged statements were illegally obtained (*ibid.*), we may " 'give great weight to the considered conclusions' of a lower court that has previously reviewed the same evidence." (*People* v. *Jennings* (1988) 46 Cal.3d 963, 979 [251 Cal.Rptr. 278, 760 P.2d 475], quoting *Miller* v. *Fenton* (1985) 474 U.S. 104, 112 [88 L.Ed.2d 405, 412, 106 S.Ct. 445].) Because the offenses charged in this case occurred after the addition of section 28, subdivision (d) to article I of the California Constitution, the voluntariness of defendant's waiver and his subsequent confession must be established by a preponderance of the evidence. (*People* v. *Markham* (1989) 49 Cal.3d 63 [260 Cal.Rptr. 273, 775 P.2d 1042].)

With these principles in mind, we turn to defendant's several assignments of error.

### a. *The Miranda Warnings*

At the commencement of defendant's interrogation, the following colloquy transpired:

Detective Cornejo: "Before I can ask you any questions I have to read you your rights. I want you to pay close attention."

Defendant: "Okay."

Detective Cornejo: "You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any question if you wish. [¶] Horace, did you understand each of these rights I've explained to you?"

Defendant: "What you have read? Yes."

Detective Cornejo: "Having these rights in mind, Horace, do you wish to talk to us now?"

Detective Ferguson: "Well, you can stop talking anytime you want to and you don't have to answer any question that you do not want to but there's two sides to every story. And for us to hear your side you have to acknowledge that your rights have been read to you and that you waive your rights."

Defendant: "Well, what do I say, I don't know."

Detective Cornejo: "Well, I'll ask you a question. If you want to answer it, answer it."

Defendant: "Oh, okay. Yeah."

■ Defendant contends the officers misadvised him of his *Miranda* rights in three respects. First, he claims that Detective Cornejo's admonition, "You have the right to talk to a lawyer and to have him present while you are being questioned," was inadequate because it failed to indicate that he had the right to counsel *prior* to questioning Defendant ignores, however, the officer's subsequent warning: "If you cannot afford to hire a lawyer, one will be appointed to represent you *before* any question if you wish." (Italics added.) Although, as defendant notes, it would have been more accurate to say "before any questioning," we do not doubt that—as given—the advice adequately informed defendant that his right to counsel attached before any questioning commenced. The United States Supreme Court has well observed that the *Miranda* warnings serve a prophylactic purpose (*Michigan v. Tucker* (1974) 417 U.S. 433, 446 [41 L.Ed.2d 182, 194, 94 S.Ct. 2357]) and therefore need not be presented in any "precise formulation" or "talismanic incantation." (*California* v. *Prysock* (1981) 453 U.S. 355, 359 [69 L.Ed.2d 696, 101 S.Ct. 2806]; accord *Duckworth* v. *Eagan* (1989) 492 U.S. 195 [106 L.Ed.2d 166, 109 S.Ct. 2875, 2879].) "Reviewing courts . . . need

not examine *Miranda* warnings as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda*.' " (*Duckworth* v. *Eagan, supra,* 492 U.S. 195, 203 [106 L.Ed.2d at p. 177, 109 S.Ct. at p. 2880].) We are satisfied that the warnings here reasonably apprised defendant of his right to consult with an attorney before being questioned.

■ Defendant next contends Detective Ferguson's comment that defendant could "stop talking anytime you want to and you don't have to answer any question," was misleading because it failed to inform defendant that he could refuse to talk altogether, and somehow implied just the reverse. Defendant overlooks the officers' clear and unequivocal warnings that he had the "right to remain silent," that anything he said could be used against him in a court of law, that he had the right to talk to an attorney and to have one present while being questioned, and that if he could not afford an attorney one would be appointed to represent him before any questioning. In light of these admonitions, we discern no reasonable possibility that defendant was confused about his right to remain silent.

Finally, defendant contends he was misled by the remarks of Detective Ferguson to believe that if he did not speak with the officers, his "side of the story" would never be told. Defendant appears to argue that Ferguson's remarks both misadvised him of his right to remain silent, and improperly coerced him into giving up that right. For the reasons previously stated, we are not persuaded that Ferguson's comments could reasonably have been understood to negate the officers' otherwise clear and unequivocal warnings that defendant had the right to remain silent and to have an attorney present before and during questioning.

Nor are we persuaded that defendant's free will was somehow "overborne" (*People* v. *Sanchez* (1969) 70 Cal.2d 562, 572 [75 Cal.Rptr. 642, 451 P.2d 74]) by Ferguson's remark, "for us to hear your side you have to acknowledge that your rights have been read to you and that you waive your rights." Defendant asks us, in effect, to infer that defendant construed this statement as a veiled threat that his "story" would never be told if he failed to talk with the officers. We find this interpretation to be excessively strained. Defendant had previously been advised that he had the right to remain silent, that anything he said could be used against him in a court of law, that he had the right to consult an attorney and that if he could not afford an attorney one would be appointed "to represent" him. It is self-evident that such rights are afforded for the very purpose of preparing and presenting an effective defense to the charges. While not entirely free of ambiguity, the officer's remark, viewed in context, simply fails to resonate with the coercive force urged by defendant.

Accordingly, we hold that defendant was properly advised of his *Miranda* rights.

### b. *Voluntariness*

Defendant also contends that the waiver of his *Miranda* rights and subsequent confession were involuntary. He claims that his will was overborne through a combination of coercive police tactics, including trickery, psychological coercion, promises of advantage and "softening up." A careful and independent review of the record as a whole reveals the contention to be without merit.

The litmus test of a valid waiver or confession is voluntariness. "The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." (*Moran* v. *Burbine* (1986) 475 U.S. 412, 421 [89 L.Ed.2d 410, 421, 106 S.Ct. 1135].) No single event or word or phrase necessarily determines whether a statement was voluntary. The answer must be derived from the totality of the facts and circumstances of each case, keeping in mind the particular background, experience and conduct of the accused. (*North Carolina* v. *Butler* (1979) 441 U.S. 369, 374-376 [60 L.Ed.2d 286, 292-294, 99 S.Ct. 1755]; *In re Walker* (1974) 10 Cal.3d 764, 777 [112 Cal.Rptr. 177, 518 P.2d 1129].) The question is "not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." (*North Carolina* v. *Butler, supra,* 441 U.S. at p. 373 [60 L.Ed.2d at p. 292].)

Defendant focuses first on the exchange between himself and Detective Cornejo following the reading of his rights. As noted, defendant's initial response was: "*Well, what do I say, I don't know.*" (Italics added.) Cornejo responded: "Well, I'll ask you a question. If you want to answer it, answer it." Defendant replied: "Oh, okay. Yeah."

Defendant argues that the italicized language reveals an inadequate appreciation of the rights being abandoned, which renders the waiver invalid; one cannot knowingly waive what one does not understand. Having listened to the tape recording of the foregoing conversation, however, we are persuaded that defendant's interpretation of this exchange is flawed. As the trial court, in analyzing the waiver, observed: " 'Well, what do I say, I don't know.' In other words, how do I proceed? I don't know how to proceed. [¶] And then Detective Cornejo says: 'I'll ask you a question, if you want to answer it, answer it.' [Defendant] says, 'Oh, okay, yeah.' Which to me sounds like, now that I understand how you're going to proceed, fine, proceed; yes, I understand." We agree with the trial court's conclusion that

defendant was not expressing *confusion* about the nature of his rights, but rather was seeking *clarification* as to how to waive them. We conclude therefore that the waiver was knowing, intelligent and uncoerced.

█ Defendant next focuses on evidence from the penalty phase of trial indicating that his overall IQ was in the low normal to borderline range, that CAT-scans revealed atrophy of brain tissue, and that he suffered from a variety of cerebral deficits, including learning disabilities, attention-deficit disorder and impulsivity. None of the foregoing evidence, however, was presented at the suppression hearing. Moreover, standing alone such evidence does not establish that the waiver was involuntary. As the United States Supreme Court has explained, "The sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental *coercion*." (*Colorado* v. *Connelly* (1986) 479 U.S. 157, 170 [93 L.Ed.2d 473, 486, 107 S.Ct. 515], italics added.) In *Connelly* the court rejected the petitioner's claim that his waiver of *Miranda* rights was rendered involuntary merely by reason of the fact that he was allegedly obeying "the voice of God" when he waived his rights and confessed. (*Ibid.* [93 L.Ed.2d at p. 487].) Here, similarly, defendant's low intelligence and psychiatric symptoms, standing alone, do not render his waiver of *Miranda* rights involuntary.

Defendant next asserts that several instances of police misconduct occurred in the course of the interrogation which, in conjunction with his low intelligence, combined to undermine his free will and voluntary choice. He repeats his earlier claim that the *Miranda* warnings were misleading and deceptive. For the reasons already stated, we find this contention to be wholly unpersuasive.

█ He also claims that the police on two separate occasions utilized methods designed to exploit his "psychological vulnerabilities." The first of these allegedly occurred during the initial interrogation session, in which defendant, under rigorous questioning, repeatedly denied any involvement in the crimes. Toward the end of that session, the following transpired: Detective Ferguson: " . . . I can't understand you keeping on denying that you did this when all the evidence said that you did. [¶] Do you believe in Jesus?"

Defendant: "Yes I do."

Detective Ferguson: "Do you believe that someday you're going to go to heaven?"

Defendant: "Yes."

Detective Ferguson: "Did your mother give you a Christian upbringing?"

Defendant: "Yes."

Detective Ferguson: "Well then you realize that by your actions denied [*sic*], you've violated your Christian upbringing along with state law and everything else."

Defendant: "Yes, I understand that." ·

Detective Ferguson: "How is your mother going to feel when she finds out you're arrested for the murder of an 11-year-old boy?"

Defendant: "Well, she's going to feel pretty upset . . . ."

Detective Ferguson: "Is that what you're afraid of?"

Defendant: "That, yeah, and losing my wife."

Detective Ferguson: "I think it's a going to be a foregone conclusion you're going to be in prison for a lot of years. I don't know if your wife is going to stick around and wait for you. Okay. That's something you're going to have to work out with her . . . ."

Defendant: "I feel bad . . . ."

Detective Cornejo: "How do you think the parents feel?"

Defendant: "Well, I understand they're, they're upset."

Detective Cornejo: "How do you think the little girl feels?"

Defendant: "She's upset, too."

Detective Cornejo: "And you're not upset at all, are you?"

Defendant: "No sir. Because I didn't . . . I haven't done anything wrong that I know of . . . ."

In evaluating a claim of psychological coercion, the "question posed . . . is whether the influences brought to bear upon the accused were 'such as to overbear petitioner's will to resist and bring about confessions not freely self-determined.'" (*People* v. *Hogan* (1982) 31 Cal.3d 815, 841 [183 Cal.Rptr. 817, 647 P.2d 93], quoting *Rogers* v. *Richmond* (1961) 365 U.S. 534, 544 [5 L.Ed.2d 760, 768, 81 S.Ct. 735].) Viewed singly or together, we are satisfied that none of the foregoing questions was so coercive as to

overcome defendant's free will or constitute "a motivating cause" of his subsequent confession. (*People* v. *Thompson* (1980) 2 Cal.3d 303, 327-328 [165 Cal.Rptr. 289, 611 P.2d 883]; *People* v. *Brommel* (1961) 56 Cal.2d 629, 632 [15 Cal.Rptr. 909, 364 P.2d 845].)

To be sure, the tactic of exploiting a suspect's religious anxieties has been justly condemned. (See *People* v. *Adams* (1983) 143 Cal.App.3d 970, 987-990 [192 Cal.Rptr. 290] [confession suppressed where interrogating officer attended the same church as defendant and made repeated references to defendant's sin, guilt, apostasy, and "reprobate mind"].) So too has the shameless exploitation of a mother's fear that if she failed to cooperate with the police she would not see her young child for many years. (*United States* v. *Tingle* (9th Cir. 1981) 658 F.2d 1332.)

Unlike the remarks at issue in *Adams* and *Tingle*, however, none of the police comments here appear to have been calculated to exploit a particular psychological vulnerability of defendant; no acute religious anxiety or sense of guilt was apparent from prior questioning, and defendant was not particularly moved by appeals to family, either the victim's or his own. Indeed, at the conclusion of the officers' remarks, defendant adamantly denied any involvement in the crimes. Thus, regardless of the propriety of the officers' statements, they simply do not appear to have been a motivating cause behind defendant's subsequent confession. (*People* v. *Thompson, supra*, 27 Cal.3d at p. 328.)

A second instance of alleged police misconduct occurred during a break between the first and second interrogation sessions, when defendant was taken to be photographed. Detective Bowen testified that when he observed defendant remove his clothes, he commented: "I don't understand how someone as strong as you could hurt an 11-year-old boy . . . . [I]t must have been someone else inside of you." According to the officer, defendant "looked around and said, 'yes, that's it, I have these terrible headaches.'" Bowen immediately told defendant to say nothing further until he could speak with Detective Cornejo. When the interrogation recommenced, defendant admitted his involvement in the shooting and attempted kidnapping.

■ Defendant now claims that Detective Bowen's remark, "it must have been someone else inside of you," constituted an impermissible suggestion that he committed the crimes while mentally ill. Defendant relies principally on *People* v. *Hogan, supra*, 31 Cal.3d 815, the seminal case in which this court condemned police questioning that "repeatedly suggested to appellant that he was unquestionably guilty and that he suffered from mental illness." (*Id.* at p. 843.) Detective Bowen's single, oblique reference

to defendant's state of mind falls well short, however, of the egregious misconduct in *Hogan,* where the defendant repeatedly expressed anxiety that he might be "crazy" and the police exploited that weakness by promising psychiatric treatment. (*Id.* at pp. 836-838.) The single, passing comment at issue here cannot reasonably be characterized as coercive, or be said to constitute a motivating cause of defendant's subsequent confession.

Defendant's final two claims of police misconduct need not detain us long. Citing *People* v. *Hinds* (1984) 154 Cal.App.3d 222 [201 Cal.Rptr. 104], he contends Detective Ferguson made an improper offer of leniency or "advantage" in suggesting that if defendant did not speak, his "side of the story" would never be told. As noted earlier, however, the contention is implausible. Furthermore, *Hinds* is inapposite. There, the police deliberately misled the defendant by telling him that anything he said "doesn't necessarily held [*sic*] against you, it can be held to help you," and further threatened that if he called his attorney they "could not help [the defendant] anymore . . . ." (*Id.* at pp. 230-231.) The record here is barren of such gross misconduct.

Defendant also attempts to characterize Detective Bowen's statement to defendant, "it must have been someone else inside of you," as inappropriate "softening-up" conversation. (See *People* v. *Honeycutt* (1977) 20 Cal.3d 150, 160 [141 Cal.Rptr. 698, 570 P.2d 1050]; *People* v. *Jackson* (1980) 28 Cal.3d 264, 298 [168 Cal.Rptr. 603, 618 P.2d 149].) As noted above, this single comment—while perhaps ill-advised—does not even remotely resemble the egregious misconduct that we have freely condemned elsewhere. (*People* v. *Hogan, supra,* 31 Cal.3d at p. 841.) Moreover, *People* v. *Honeycutt, supra,* 20 Cal.3d 150, on which defendant relies, is clearly distinguishable. There, the police deliberately engaged the suspect in an unrecorded 30-minute, pre-*Miranda* conversation, discussing mutual acquaintances, past events and finally the victim. No misconduct of that nature occurred here.

Accordingly, we hold that the motion to suppress was properly denied.

B. *Change of Venue*

Defendant next contends the trial court erred in denying his motions for change of venue.

■ The salient principles on review of a motion for change of venue are well settled. "A change of venue must be granted when the defendant shows a reasonable likelihood that in the absence of such relief, a fair trial cannot be had. [Citations.] Whether raised on petition for writ of mandate or on appeal from judgment of conviction, the reviewing court must independent-

ly examine the record and determine de novo whether a fair trial is or was obtainable. [Citations.] The factors to be considered are the nature and gravity of the offense, the nature and extent of the news coverage, the size of the community, the status of the defendant in the community, and the popularity and prominence of the victim." (*People* v. *Harris* (1981) 28 Cal.3d 935, 948 [171 Cal.Rptr. 679, 623 P.2d 240]; see also *People* v. *Williams* (1989) 48 Cal.3d 1112, 1125 [259 Cal.Rptr. 473, 774 P.2d 146]; *Odle* v. *Superior Court* (1982) 32 Cal.3d 932, 937 [187 Cal.Rptr. 455, 654 P.2d 225].)

With these principles in mind, we have examined the record to determine the potential for prejudice from pretrial publicity. We find the record negates any likelihood defendant was denied a fair and impartial jury.

■ Defendant moved for a change of venue before trial, citing four newspaper and five radio and television reports. Most of the reports were filed at the time of the shooting, over a year earlier. All were fact based. Several credited the heroism of the victim in saving his young cousin's life, but otherwise contained no inflammatory matter. The trial court, after a hearing, denied the motion, noting that the pretrial publicity was dated and relatively mild, that the case had not elicited unusually heavy media attention, that Riverside County contained a large and diverse population, and that the victim was not a particularly prominent member of the community—although he had attained some notoriety due to the circumstances of his death.

Defendant renewed his motion for change of venue upon completion of the jury voir dire. The motion was denied. In addition to the factors noted above, the trial court observed that the voir dire process had confirmed defendant's ability to obtain a fair and impartial jury. Of the twelve jurors selected, six had absolutely no prior knowledge of the case; five had vague recollections of the incident but assured the court that they could decide the case based on the facts presented at trial to the exclusion of any prior knowledge; and only one, Juror Brunner, indicated anything resembling a clear memory of the facts; she too, however, swore that she could be objective and decide the matter exclusively on the evidence at trial. Hence, the court concluded that a "fair trial [was] obtainable in this case."

That decision was manifestly correct. The pretrial publicity was neither extensive nor particularly inflammatory. The community, Riverside County, is large and diverse. Although the victim was sympathetic, this was attributable more to his age and heroism than to any particular prominence he enjoyed in the community. Finally, the voir dire itself dispelled any doubt as to defendant's ability to receive a fair and impartial jury. Six of the

jurors had not been exposed to any pretrial publicity, and none of the remainder remembered anything damaging to defendant or held any opinion concerning his guilt or innocence. Each attested that he or she could render a fair and impartial verdict based exclusively on the evidence presented at trial.

Because six jurors vaguely recalled the shooting, however, defendant contends the jury could not be fair and impartial. We disagree. As this court has observed, " 'It is not required . . . that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion of the merits of the case . . . . It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' " (*People* v. *Harris, supra*, 28 Cal.3d at pp. 949-950, quoting *Irvin* v. *Dowd* (1961) 366 U.S. 717, 722-723 [6 L.Ed.2d 751, 755-756, 81 S.Ct. 1639].) Examined under these guidelines, the record leaves no doubt that defendant was afforded a fair and impartial trial.

### C. *Sufficiency of Evidence*

 Defendant next contends the first degree murder conviction must be reversed because the evidence was insufficient as a matter of law to demonstrate premeditation and deliberation.

 When the sufficiency of the evidence is challenged, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255], quoting *Jackson* v. *Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 573, 99 S.Ct. 2781]; accord *People* v. *Guerra* (1985) 40 Cal.3d 377, 385 [220 Cal.Rptr. 374, 708 P.2d 1252]; *People* v. *Caldwell* (1984) 36 Cal.3d 210, 217 [203 Cal.Rptr. 433, 681 P.2d 274].) With respect to a jury finding of premeditation and deliberation, we have observed that the "true test [of premeditation] is not the duration of time as much as the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." (*People* v. *Thomas* (1945) 25 Cal.2d 880, 900 [156 P.2d 7]; accord *People* v. *Robertson* (1982) 33 Cal.3d 21, 49-50 [188 Cal.Rptr. 77, 655 P.2d 279].) The type of evidence this court has found to be sufficient falls into three basic categories: planning, motive, and manner. (*People* v. *Anderson* (1968) 70 Cal.2d 15, 26-27 [73 Cal.Rptr. 550, 447 P.2d 942].)

▉ Applying these principles to the facts at hand, we find that the record amply supports a finding of premeditation and deliberation. There was strong evidence of a well-planned, sexually motivated attack. Shannon, the victim's young companion, recalled that defendant's van was strategically parked on the shoulder ahead of the children with the motor idling. Defendant deliberately walked past the children to observe which was female, then attacked the girl from behind, placed the barrel of a .357 magnum pistol against her head, and dragged her 10 feet toward the waiting van. When she asked if he wanted money, he replied, "No, I don't want your money. Just shut the hell up."

The killing, moreover, was calculated and deliberate. Defendant first demanded that Shannon call her "brother," who had run to the middle of the street and was desperately attempting to flag a passing car for assistance. When Danny returned, he kicked defendant, enabling Shannon to escape. She ran some distance, turned and perceived a flash and a gunshot, followed by another shot. She then heard Danny say, "Don't shoot me again, I'll die this way." After a pause, a third shot registered. Autopsy and forensic evidence revealed that the first round struck Danny squarely in the chest. The second, fired as Danny lay helpless on his back, missed; the third, fired from a distance of four to six inches, struck him between the eyes and caused instant death.

It is plain that this was no random or indiscriminate assault (cf. *People* v. *Anderson, supra,* 70 Cal.2d 15); defendant immobilized his victim with the first shot, fired again and missed, then placed his pistol four to six inches from the victim's head and fired a bullet between his eyes. Defendant nevertheless insists that the facts do not demonstrate a plan or preconceived intent to kill, but at most an intent to kidnap the girl for the purpose of a sexual assault. The shooting, he asserts, was not deliberate and premeditated, but rather the result of an inexplicable "explosion of violence" more consistent with a lesser grade of homicide than first degree murder.

As in *People* v. *Robertson, supra,* 33 Cal.3d 21, however, we need not "determine whether the evidence is sufficient to [demonstrate] . . . that defendant had contemplated the possibility of killing his victims *from the outset,* for . . . the jury could still have found on the record that the killings were premeditated and deliberate." (*Id.* at p. 49, italics added.) The jury here could reasonably have concluded that defendant formed a considered intent to kill when Danny's actions threatened to reveal his plan to kidnap and rape the young girl, and he immediately carried out his intent to prevent any such occurrence. Accordingly, the evidence supports a finding that the killing was willful, deliberate and premeditated beyond a reasonable doubt.

### D. *Corpus Delicti*

 Defendant also challenges the first degree murder conviction on the ground that the prosecution improperly relied on an alternative theory of felony murder. He argues that the corpus delicti of the underlying felony (in this case attempted rape) must be established by evidence independent of defendant's extrajudicial statements. The contention plainly lacks merit. It is well settled that "the People need *not* establish the corpus delicti of the underlying felony before introducing a defendant's extrajudicial statements." (*People v. Cantrell* (1973) 8 Cal.3d 672, 680 [105 Cal.Rptr. 792, 504 P.2d 1256], italics added; accord *People v. Howard* (1988) 44 Cal.3d 375, 414 [243 Cal.Rptr. 842, 749 P.2d 279]; *People v. Memro* (1985) 38 Cal.3d 658, 697, fn. 46 [214 Cal.Rptr. 832, 700 P.2d 446]; *People v. Mattson* (1984) 37 Cal.3d 85, 93 [207 Cal.Rptr. 278, 688 P.2d 887].) Thus, defendant's statements to the officers indicating that he intended to rape the little girl constituted a sufficient basis for a finding of first degree felony murder.

Defendant's reliance on *People v. Mattson, supra,* 38 Cal.3d 672, is misplaced. As we explained in *People v. Howard, supra,* 44 Cal.3d at page 415: "[W]e did not disapprove of *Cantrell's* holding in *Mattson*; rather, we concluded that an exception to the *Cantrell* approach was required by the specific language of section 190.4," which provides that the felony underlying a special circumstance allegation "shall be charged and proved pursuant to the general law applying to the trial and conviction of the crime." (§ 190.4, subd. (a).) Defendant here was not charged with a special circumstance of attempted rape. Therefore, the prosecution was not required to establish the corpus delicti of that offense independently of defendant's statements.

### E. *Instruction on Lesser Included Offense*

Defendant further claims the trial court erred in refusing his requested instruction on felony false imprisonment.

Charged with the special circumstance of murder in the commission or attempted commission of the crime of kidnapping, defendant requested an instruction on the lesser and necessarily included offense of felony false imprisonment. (§ 236; CALJIC No. 9.60.) The trial court denied the request, observing that the evidence rendered such an instruction "superfluous." We agree.

 It is, of course, axiomatic that "in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] . . . That

obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citations], but not when there is no evidence that the offense was less than that charged." (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913].) Thus, it has long been settled that the trial court need not, even if requested, instruct the jury on the existence and definition of a lesser and included offense if the evidence was such that the defendant, if guilty at all, was guilty of the greater offense. (*People* v. *John* (1983) 149 Cal.App.3d 798, 810 [197 Cal.Rptr. 340]; *People* v. *Hulderman* (1976) 64 Cal.App.3d 375, 379 [134 Cal.Rptr. 223]; *People* v. *Morrison* (1964) 228 Cal.App.2d 707, 713 [39 Cal.Rptr. 874].)

Here, all of the evidence indicated that defendant intended to kidnap the children. He parked his van a short distance ahead of the children on the shoulder of the road; the engine was running. He assaulted the young girl from behind, placed a gun to her head and dragged her some distance toward the van; she resisted by dragging her heels along the ground. He said he didn't want her money. He admitted on several occasions that he intended to drive the girl away from the scene for the purpose of sexually assaulting her.

The physical evidence, the testimony of an eyewitness, and defendant's own statements all point indisputably to an attempted kidnapping. Defendant offered no evidence or argument that his only purpose was to forcibly detain the victims at the scene. It is true, as defendant asserts, that he made several equivocal statements during the police interrogation concerning his intent to rape; at several points he stated that he merely intended to take the victims "home." Defendant mistakenly assumes, however, that there must be an intent to commit an underlying crime before a simple kidnapping or attempted kidnapping can be found to occur. ■■■ On the contrary, a person who forcibly carries and transports another, capable of giving consent, against his or her will, is guilty of kidnapping "however good or innocent [the defendant's] motive or intent may otherwise be . . . ." (*People* v. *Oliver* (1961) 55 Cal.2d 761, 765-766 [12 Cal.Rptr. 865, 361 P.2d 593]; see also *People* v. *Apo* (1972) 25 Cal.App.3d 790, 797 [102 Cal.Rptr. 242].)

The requested instruction on felony false imprisonment was properly denied.

F. *Challenges for Cause*

Defendant contends the trial court erroneously overruled his challenges for cause to nine prospective jurors each of whom, he claims, made it clear

that his or her views in favor of the death penalty "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his [or her] oath' . . . ." (*Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 851-852, 105 S.Ct. 844]; see also *People* v. *Coleman* (1988) 46 Cal.3d 749, 764-771 [251 Cal.Rptr. 83, 759 P.2d 1260].) The contention lacks merit.

■ To complain on appeal that a prospective juror should have been excused for cause, the defendant must have exercised and exhausted his peremptory challenges. (*People* v. *Stankewitz* (1990) 51 Cal.3d 72, 103 [270 Cal.Rptr. 817, 793 P.2d 23]; *People* v. *Coleman, supra,* 46 Cal.3d at pp. 770-771.) Of the nine prospective jurors here in question, six were ultimately called to sit as jurors, three of the six were removed by defendant's use of peremptory challenges, and one was dismissed as a result of the prosecutor's peremptory challenge. Defendant failed to challenge the remaining two jurors, notwithstanding the fact that he had eleven peremptory challenges remaining which he never exercised. Thus, even assuming arguendo that the trial court erroneously denied defendant's challenges for cause, the error was harmless; as noted, defendant cannot complain on appeal that objectionable jurors were forced upon him where he could have had them excused by peremptory challenge. (*People* v. *Coleman, supra,* 46 Cal.3d at pp. 770-771.)

Defendant contends, however, that the harmless error rule should not apply in a capital case. We recently rejected an identical claim in *People* v. *Gordon* (1990) 50 Cal.3d 1223, 1247 [270 Cal.Rptr. 451, 792 P.2d 251]. Defendant presents no persuasive reasoning or authority to warrant a reconsideration of our holding.

Furthermore, our review of the record discloses that although the prospective jurors in question gave conflicting answers to questions concerning their views on capital punishment—expressing a preference under certain circumstances for the death penalty—each of them ultimately confirmed that he or she would follow the court's instructions and keep an open mind concerning life without possibility of parole as an alternative disposition. (See *People* v. *Ruiz* (1988) 44 Cal.3d 589, 618, 619 [244 Cal.Rptr. 200, 749 P.2d 854].) ■ Where conflicting or equivocal responses are elicited on voir dire, the trial court's determination of impartiality is generally binding on this court. (*Id.* at p. 619; *People* v. *Coleman, supra,* 46 Cal.3d at p. 767; *People* v. *Ghent* (1987) 43 Cal.3d 739, 768 [239 Cal.Rptr. 82, 739 P.2d 1250].) We conclude, therefore, that the trial court's failure to excuse the prospective jurors was not error.[4]

---

[4] In view of defendant's failure to exhaust his peremptory challenges, and the jurors' affirmance that they would impartially consider both sentencing options, we need not address

## II. *Penalty Issues*

### A. *Cross-examination of Dr. Hoyle*

 Defendant contends the trial court erred in overruling an objection to the prosecutor's cross-examination of a defense expert, Dr. Hoyle, concerning the possibility that defendant matched the sex offender psychological "profile." Defendant predicates error on the grounds that the cross-examination: (1) exceeded the scope of the direct examination; (2) introduced inadmissible character evidence; and (3) lacked an adequate foundation because Dr. Hoyle had not been qualified as an expert in the area of personality profiles, and such profiles had not been shown to be accepted in the scientific community (see *People* v. *Kelly* (1976) 17 Cal.3d 24, 30 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013, 1014).[5]

Assuming, solely for the sake of argument, that any of the foregoing claims has merit, it is clear nevertheless that defendant could not have been prejudiced by the disputed testimony. Dr. Hoyle, a clinical psychologist, was one of several mental health experts called by defendant at the penalty phase. His testimony, based on an interview with defendant and a review of defendant's school records, social history and tests performed by other experts, indicated that defendant's psychological makeup—characterized by a low normal to borderline IQ, impulsiveness, distorted perceptions of reality, and "schyzotypal" personality—was consistent with tests showing organic brain damage or atrophy.

During his cross-examination of Dr. Hoyle, the prosecutor at one point asked: "Doctor, these items that we just covered, don't they fit the profile of a sex offender, a rapist?" A defense objection to the question was overruled. Dr. Hoyle then responded as follows: "Well, first of all, it seems like you said mentally disordered sex offender maybe or rapist but let's go with sex offender and rapist, neither of those terms are psychiatric diagnosis [*sic*], I'm not aware that Mr. Kelly had ever committed, you know, any acts of

defendant's additional claim that the trial court erroneously applied the more stringent *Witherspoon* standard (*Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770] [whether the juror would "automatically" vote for or against the imposition of capital punishment]) rather than the test set forth in *Wainwright* v. *Witt, supra,* 469 U.S. 412, 424 [83 L.Ed.2d at pp. 851-852], and adopted by this court in *People* v. *Ghent, supra,* 43 Cal.3d at page 767 (i.e., " 'whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." . . . [T]his standard . . . does not require that a juror's bias be proved with "unmistakable clarity." ' ")

[5] We have recently ruled that a qualified psychologist's expert testimony, based in part upon his interpretation of standardized personality tests, need not be shown to meet the standards for "new scientific techniques" under *Kelly/Frye.* (*People* v. *Stoll* (1989) 49 Cal.3d 1136 [265 Cal.Rptr. 111, 783 P.2d 698].)

rape or sex offense. He had been sexually molested, I believe by his father, however, the only predictor I could come up with that would be useful in a case like that would be whether or not he had ever done it in the past and as far as my record indicates he had not."

Pressed to consider whether someone would match the profile if, hypothetically, he had committed rape in the past and also had defendant's psychosocial background—particularly the fact that he was a loner, had limited sexual experience, and was married to an older woman—Dr. Hoyle responded: "Well, again, I would have to say that those two, you know, labels that you gave me are not psychiatric diagnoses. At the same time, you know, I'd have to say obviously the man is capable of raping someone if he in fact had, but the mere fact that he marries an older woman . . . I don't feel is adequate to make that conclusion nor is the fact that he had limited sexual experience adequate to draw that conclusion, nor is the fact that he's a loner."

Stymied in his attempt to label defendant as a stereotypical sex offender, the prosecutor quickly retreated from this line of inquiry. His next question was: "I assume then that in the four years that you have been practicing, you haven't worked with many people who were violent sex offenders?" The witness readily acknowledged that he had not: "That certainly wasn't the focus of my treatment." After several further questions, the cross-examination was completed.

As the record thus discloses, not only did Dr. Hoyle fail to respond affirmatively when asked whether defendant matched the so-called sex offender "profile," he flatly rejected the notion. As a result, the prosecutor was compelled to abandon the inquiry. Accordingly, there is no reasonable possibility that a result more favorable to defendant might have resulted absent the testimony in question. (*People* v. *Allen* (1986) 42 Cal.3d 1222, 1281 [232 Cal.Rptr. 849, 729 P.2d 115].)

B. *Photographs*

 Defendant next contends he was prejudiced at both the guilt and penalty phases by the improper admission of certain photographs. At the guilt phase, these consisted of five photographs of the victim (Danny O.), one of the crime scene, and one of the victim while still alive.[6] At the penalty phase, the prosecution introduced four photographs of the victims of the San Bernardino homicides (one of Reed and three of Houser), one photo of

---

[6] The prosecutor apparently showed several of the photos, including that of Danny while still alive, as slides during his argument.

the crime scene, and one photograph of Houser while still alive. In addition, the prosecutor showed four slides—three of Reed's body at the crime scene and one autopsy photo of Danny O.—during penalty phase argument.[7] Defendant claims the photographs were irrelevant, inflammatory and cumulative.

The photographs were not irrelevant. The principal point of dispute at guilt phase turned on whether Danny's killing was willful, deliberate and premeditated, or the result of a spontaneous violent outburst. The photographs depicting the placement of the wounds and powder burns clearly supported the prosecution's theory that the murder was cold-blooded and intentional. (*People* v. *Melton* (1988) 44 Cal.3d 713, 741 [244 Cal.Rptr. 867, 750 P.2d 741].) As we recently observed in *People* v. *Turner* (1990) 50 Cal.3d 668 [268 Cal.Rptr. 706, 789 P.2d 887], "The prosecution was not obliged to prove these details solely from the testimony of live witnesses, and the jury was entitled to see how the physical details of the scene and body supported the prosecution theory . . . ." (*Id.* at p. 706; accord *People* v. *Melton, supra,* 44 Cal.3d at p. 741; *People* v. *Hendricks* (1987) 43 Cal.3d 584, 594 [238 Cal.Rptr. 66, 737 P.2d 1350].) The Chinese proverb of old states it well: "One picture is worth more than a thousand words." Therefore, we hold the photos of Danny were neither irrelevant nor cumulative.

Nor was the probative value of the photographs in question outweighed by their prejudicial effect. Although "murder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant" (*People* v. *Pierce* (1979) 24 Cal.3d 199, 211 [155 Cal.Rptr. 657, 595 P.2d 91]), our independent review of the photos persuades us that they were not unduly gruesome or inflammatory. (*People* v. *Turner, supra,* 50 Cal.3d at p. 706; *People* v. *Melton, supra,* 44 Cal.3d at pp. 741-742; *People* v. *Hendricks, supra,* 43 Cal.3d at p. 594.)

■■■ The photograph of Danny while still alive was not necessary to establish the identity of the victim—there was no dispute as to that issue—and was only marginally relevant to show that the victim was young and thus constituted no threat to defendant. On the whole, the photo probably should have been excluded. (*People* v. *Hendricks, supra,* 43 Cal.3d 584, 594.) The error, if any, however, must be deemed harmless. This was not a close case in which sympathy for the victim might have led the jury to improperly convict; the evidence of defendant's culpability was clear and

[7] Defendant asserts that the photo of Danny while still alive was also introduced at the penalty phase. The record does not show, however, that this particular photo was reintroduced at the penalty phase.

uncontradicted. Accordingly, the introduction of the photograph does not warrant reversal. (*Id.* at pp. 594-595.)

We reach the same conclusion with respect to the photographs introduced at penalty phase. The photos of the victims and the crime scenes lent credence to the prosecution's theory that defendant sexually assaulted the two women and then deliberately killed them to eliminate any witnesses to the crimes. (*People* v. *Melton, supra,* 44 Cal.3d at p. 741.) Nor were the photos unduly gruesome. (*People* v. *Hendricks, supra,* 43 Cal.3d at p. 594.)

Finally, we reject defendant's assertion that the admission of the photographs of Danny O. and Ursula Houser while still alive was unduly prejudicial and constituted reversible error under *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529] and *South Carolina* v. *Gathers* (1989) 490 U.S. 805 [104 L.Ed.2d 876, 109 S.Ct. 2207]. Although arguably inappropriate as evidence tending to arouse sympathy for the victims, the two photographs do not rise to the level of the victim impact evidence condemned by the high court in *Booth* and *Gathers*. Therefore, we are persuaded that the error, if any, was harmless beyond a reasonable doubt. (*People* v. *Stankewitz, supra,* 51 Cal.3d at p. 112; *People* v. *Adcox* (1988) 47 Cal.3d 207, 259-260 [253 Cal.Rptr. 55, 763 P.2d 906]; *People* v. *Malone* (1988) 47 Cal.3d 1, 38-39 [252 Cal.Rptr. 525, 762 P.2d 1249].)

### C. *Rebuttal Evidence*

■ Defendant next contends the trial court erred in permitting the prosecutor to introduce certain rebuttal evidence. As explained below, the contention lacks merit.

Defendant called his wife, Christine Kelly, to testify to his virtues as a loving husband and father to their infant daughter. Thereafter, over objection, the court allowed the prosecution to call Mrs. Kelly as a rebuttal witness. The court correctly noted that by testifying for the defense, Mrs. Kelly had waived her privilege not to be a witness or to testify against her spouse. (Evid. Code, § 973, subd. (a).) The court further ruled, however, that the prosecutor would not be permitted to inquire into any confidential marital communication. (Evid. Code, § 980.) As a result of the court's ruling, defendant entered into the following stipulation. "[I]f Christine Kelly were called as a witness, she would testify that on Saturday, November 17th, 1984, the defendant showed her two rings which have been marked People's No. 114 and People's No. 115. The defendant gave her the ring marked People's No. 115. [¶] The next day, Sunday, November 18th, 1984, she accompanied the defendant to her mother's residence in Los Angeles where the defendant sold the second ring, People's No. 114, to her mother

for $10." The prosecution subsequently called John Brown, Ms. Houser's boyfriend, who testified that both rings had belonged to the victim.

"The admission of rebuttal evidence rests largely within the sound discretion of the trial court and will not be disturbed on appeal in the absence of 'palpable abuse.'" (*People* v. *Carrera* (1989) 49 Cal.3d 291, 323 [261 Cal.Rptr. 348, 777 P.2d 121].) The record here does not support a finding that the trial court committed "palpable abuse" in ruling that the evidence was unavailable to the prosecution for presentation during its case-in-chief. As to whether the evidence was within the proper scope of rebuttal, although a closer question, it does not appear the court palpably abused its discretion in admitting the sale of the ring to rebut defendant's evidence in mitigation that he was a simple and innocent soul, honest and hardworking.

"The admission of rebuttal evidence rests largely within the sound discretion of the trial court and will not be disturbed on appeal in the absence of 'palpable error.'" (*People* v. *Carrera* (1989) 49 Cal.3d 291, 323 [261 Cal.Rptr. 348, 777 P.2d 121].) The record here does not support a finding that the trial court committed "palpable error" in ruling that the evidence was unavailable to the prosecution for presentation during its case-in-chief. As to whether the evidence was within the proper scope of rebuttal, although a closer question, it does not appear the court palpably erred in admitting the sale of the ring to rebut defendant's evidence in mitigation that he was a simple and innocent soul, honest and hardworking.

### D. *Other Crimes*

Defendant contends the introduction of the two unadjudicated homicides charged in San Bernardino County violated his constitutional rights under the Eighth and Fourteenth Amendments. He also claims that he was constitutionally entitled to have a different jury decide the penalty phase from that which decided the guilt phase. We rejected identical claims in *People* v. *Balderas* (1985) 41 Cal.3d 144, 205 [222 Cal.Rptr. 184, 711 P.2d 480], and *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113]. Defendant has presented us with no persuasive reasoning or authority to warrant departure from our holdings in those cases.

### E. *Instructions on Other-crimes Evidence*

Defendant asserts the trial court erred in failing to instruct sua sponte that the prosecution had the burden of proof with respect to other-crimes evidence, and that defendant was presumed innocent of such charges. The trial court instructed the jury that the uncharged homicides must be proved beyond a reasonable doubt. We have held that such an instruction is ade-

quate. (*People* v. *Davenport* (1985) 41 Cal.3d 247, 280-282 [221 Cal.Rptr. 794, 710 P.2d 861].) Further instructions in the nature of those urged by defendant were not required.

### F. *Alleged Prosecutorial Misconduct*

Defendant contends the prosecutor committed prejudicial misconduct during penalty phase argument in three separate respects.

First, he asserts the prosecutor made improper reference to the victim's personal characteristics in violation of *Booth* v. *Maryland, supra,* 482 U.S. 496, and *South Carolina* v. *Gathers, supra,* 490 U.S. 805 [104 L.Ed.2d 876, 109 S.Ct. 2207]. The remarks in question consisted of two separate and isolated comments. The first was as follows: "You can consider the age of the defendant, probably in relationship to most of the population, the defendant is not that old. He's in his mid 20's. *How old was Danny when he got killed.*"[8] The second remark, which also concerned Danny, came somewhat later and consisted of the following: "But that little boy exhibited a trait, something that I would hope that we would consider good, commendable, something that if everyone in our society—". Defendant thereupon interposed an objection which was overruled, and the prosecutor continued: "We all have that. And if the defendant had just one percent of what Danny had no one would be killed."

While arguably inappropriate, we are nevertheless persuaded that the prosecutor's comments here had no appreciable affect on the penalty verdict. Unlike *Booth* and *Gathers*, which involved, respectively, the introduction at trial of a lengthy victim impact statement and extensive prosecutorial comment on the victim's religious and civic character, these remarks were relatively brief and mild; they contained no details pertaining to the actual impact and suffering inflicted on the victim or his family, and made only passing reference to the victim's character. Thus, as we concluded in *People* v. *Ghent, supra,* 43 Cal.3d 739, the prejudicial effect of the prosecutor's comments here was "undoubtedly minimal or nonexistent." (43 Cal.3d at p. 772.) We are persuaded that the error, if any, was harmless beyond a reasonable doubt. (*People* v. *Adcox, supra,* 47 Cal.3d at pp. 259-260; *People* v. *Malone, supra,* 47 Cal.3d at pp. 38-39; *People* v. *Ghent, supra,* 43 Cal.3d at pp. 771-772.)[9]

---

[8] Defendant did not object to the reference to Danny's age or request a curative instruction. Accordingly, the first disputed remark may not be raised on appeal. (*People* v. *Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468].)

[9] In an apparently related argument, defendant contends the prosecutor somehow erred in pointing out that many people share defendant's social and economic background and have IQ's equal to or lower than defendant's. We find nothing objectionable in these remarks,

 Defendant next asserts the prosecutor improperly commented on defendant's failure to produce evidence of prior acts of violence, as follows: "[I]f there was something wrong with the defendant physically because he was a premature baby why did it take 25 years to show. [¶] [I]f the violence that was directed towards him was so great, so consistent, so common, why didn't we see signs of the same in him at an earlier age?" An objection to prosecutor's remark as calling for "speculation" was overruled.

Defendant contends the foregoing constituted improper comment on defendant's failure to produce evidence, in violation of *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]. We do not agree. The prosecutor here merely pointed out that defendant had failed to adduce evidence to substantiate his claim that Danny's murder was the result of long-standing psychological and social pathologies. *Griffin* prohibits reference to a defendant's failure to testify in his own behalf; it does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or call logical witnesses. (*People* v. *Szeto* (1981) 29 Cal.3d 20, 34 [171 Cal.Rptr. 652, 623 P.2d 213]; *People* v. *Vargas* (1973) 9 Cal.3d 470, 475 [108 Cal.Rptr. 15, 509 P.2d 959].)

 Finally, defendant claims that the prosecutor improperly argued facts not in evidence. He refers to several isolated remarks suggesting that defendant's motive in killing Danny, Ursula Houser and Sonia Reed, was to escape apprehension by eliminating any potential witnesses to his other crimes.[10] Defendant's claim lacks merit. Only one of the prosecutor's remarks elicited an objection, which was overruled. (See *People* v. *Green, supra,* 27 Cal.3d at p. 34.) Moreover, it is well settled that the prosecutor has broad discretion to state his or her views as to what the evidence shows and what inferences may be drawn therefrom. (*People* v. *Lewis* (1990) 50 Cal.3d 262, 283 [266 Cal.Rptr. 834, 786 P.2d 892]; *People* v. *Milner* (1988) 45 Cal.3d 227, 245 [246 Cal.Rptr. 713, 753 P.2d 669]; *People* v. *Warren* (1988) 45 Cal.3d 471, 485, fn. 1 [247 Cal.Rptr. 172, 754 P.2d 218]; *People* v. *Beivelman* (1968) 70 Cal.2d 60, 76-77 [73 Cal.Rptr. 521, 447 P.2d 913], disapproved on other grounds in *People* v. *Green, supra,* 27 Cal.3d at pp. 33-34.) The prosecutor here properly deduced from the evidence that defendant's motive for the San Bernardino killings was to avoid apprehension by eliminating the witnesses to his sexual crimes. Both victims were nude from

---

which were apparently intended to rebut defendant's evidence in mitigation, and to focus attention on defendant's personal moral culpability for the crimes.

[10] These isolated comments included the following: "Ladies and gentlemen, we have been dealing with an individual, the defendant, who kills so he won't be caught . . . ." "Ladies and gentlemen, the defendant did not kill by accident or because of stress. He killed the victims of his other attempted crimes so there wouldn't be any witnesses, just as pure and simple as that. Just like he killed Danny to get away with that, that's what he did with these two women . . . ." "She [i.e., Shannon P.] would have been the defendant's fourth victim."

the waist down, and both died as a result of massive contact wounds from a .357 magnum pistol; the barrel of the gun had been literally pressed against the victims' bodies. In addition, Houser's body revealed abrasions consistent with the victim having been dragged across dirt and asphalt. The circumstances of Danny's murder suggested even more strongly an intent to avoid detection and capture.

The facts here amply supported the prosecutor's statements. (*People* v. *Milner, supra*, 45 Cal.3d at p. 245; *People* v. *Beivelman, supra*, 70 Cal.2d at p. 76.) There was no misconduct.

### G. *Failure to Delete Inapplicable Mitigating Factors*

 Defendant contends the court erred by failing to delete sua sponte all inapplicable mitigating factors from its instruction, specifically factors (e), (f), (g) and (j). (CALJIC former No. 8.84.1.)[11] We have previously rejected a substantially identical claim. (*People* v. *Miranda* (1987) 44 Cal.3d 57, 104-105 [241 Cal.Rptr. 594, 744 P.2d 1127].) Indeed, we have recently observed that "the better practice [is] for a court to instruct on all the statutory penalty factors, directing the jury to be guided by those that are applicable on the record." (*People* v. *Marshall* (1990) 50 Cal.3d 907, 932 [269 Cal.Rptr. 269, 790 P.2d 676].) Defendant has advanced no persuasive argument or authority to cause us to reconsider our prior holdings.

### H. *Extreme Mental or Emotional Distress as a Mitigating Factor*

 In accordance with section 190.3, factor (d) (CALJIC former No. 8.84.1) the jury was instructed to consider "[w]hether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance." Defendant asserts that by referring to "extreme" conditions, the instruction precluded consideration of any lesser disturbance.

The contention lacks merit. In *People* v. *Ghent, supra*, 43 Cal.3d 739, we held that in light of the "catchall" instruction that the jury may consider "any other circumstance which extenuates the gravity of the crime" (former § 190.3, factor (j), now § 190.3, factor (k)), the jury was aware that it could

---

[11] These factors provided: "(e) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act. [¶] (f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct. [¶] (g) Whether or not the defendant acted under extreme duress or under the substantial domination of another person. [¶] . . . [¶] (j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor."

take into account a mental condition "which, though perhaps not deemed 'extreme,' nonetheless mitigates the seriousness of the offense." (43 Cal.3d at p. 776; accord *People* v. *Hunter* (1989) 49 Cal.3d 957, 987-988 [264 Cal.Rptr. 367, 782 P.2d 608]; *People* v. *Adcox, supra,* 47 Cal.3d at p. 270; *People* v. *Babbitt* (1988) 45 Cal.3d 660, 720 [248 Cal.Rptr. 69, 755 P.2d 253].)

The instructions given to the jury went beyond this, however. At defendant's request the court instructed that, in addition to the statutory penalty factors, the jury could consider additional factors in mitigation, including the "circumstances and effects of [defendant's] premature birth," the "circumstances and effects of his being abused as a child by his father," his "educational background and experiences," "his religious background and experiences," and "his physical condition."[12] In addition, both the prosecutor and defense counsel devoted considerable argument to defendant's claims of psychological impairment.

Thus, in light of the court's instructions and the arguments of counsel, we conclude that the jury was properly permitted to consider any mitigating evidence relating to defendant's alleged mental or emotional disturbance. (*People* v. *Hunter, supra,* 49 Cal.3d at pp. 987-988; *People* v. *Babbitt, supra,* 45 Cal.3d at pp. 720-721; *People* v. *Lucky* (1988) 45 Cal.3d 259, 296-297 [247 Cal Rptr. 1, 753 P.2d 1052].)

I. *Failure to Instruct on Proof Beyond a Reasonable Doubt as to Aggravating Circumstances*

In his next assignment of error, defendant contends the court erred by failing to instruct the jury sua sponte that they could fix the penalty at death only if they found beyond a reasonable doubt that the aggravating circumstances substantially outweighed the mitigating circumstances and that death was the appropriate punishment. We have previously rejected this argument. (*People* v. *Bonillas* (1989) 48 Cal.3d 757, 790 [257 Cal.Rptr. 895, 771 P.2d 844]; *People* v. *Rodriguez, supra,* 42 Cal.3d 730 at p. 777; *People* v. *Williams* (1988) 44 Cal.3d 883, 960 [245 Cal.Rptr. 336, 751 P.2d 395].)

---

[12] The special instruction given to the jury provided, in its entirety, as follows: "Further, as a basis for sentence less than death, mitigating factors which the jury may consider include, but the jury is not limited to, any of the following: [¶] 1. The circumstances and effects of Mr. Kelly's premature birth; [¶] 2. The circumstances and effects of his being abused as a child by his father; [¶] 3. His accepting responsibility of being a provider for his family at an early age; [¶] 4. His educational background and experiences; [¶] 5. His religious background and experiences; [¶] 6. His desire and ability to work and his good record of employment. [¶] 7. His love for and from his family, friends and persons who have known him; [¶] 8. His history of being a good husband and father; [¶] 9. His physical condition."

### J. *Failure to Require Written Findings*

 Defendant next claims that the court erred in failing to require a written statement from the jury detailing the evidence upon which it relied and its reasons for imposing the death penalty. We have determined that such written findings are not required by law and are not necessary to protect a defendant's due process and Eighth Amendment rights. (*People* v. *Rodriguez, supra*, 42 Cal.3d at pp. 777-779; *People* v. *Jackson, supra*, 28 Cal.3d at pp. 316-317; see also *Harris* v. *Pulley* (9th Cir. 1982) 692 F.2d 1189, 1195, revd. on other grounds *sub nom. Pulley* v. *Harris* (1984) 465 U.S. 37 [79 L.Ed.2d 29, 104 S.Ct. 871].)

### K. *"Cumulative" Prejudice*

Defendant contends that viewed together, the various alleged errors at penalty phase compel reversal of the verdict of death. Having rejected the bulk of defendant's claims as utterly lacking in merit, however, there is simply no basis for the assertion of cumulative prejudice. From our review of the record, we are persuaded that defendant received a fair and untainted trial. That is all the Constitution requires. (*People* v. *Williams* (1988) 45 Cal.3d 1268, 1333 [248 Cal.Rptr. 834, 756 P.2d 221].)

### L. *Modification of Penalty*

Finally, defendant contends the trial court committed prejudicial error in ruling on the automatic modification motion (§ 190.4, subd. (e)) by failing to consider that defendant had no prior felony convictions. (§ 190.3, factor (c).)

 "[I]n ruling on the automatic motion to modify a death verdict, the trial judge's function is not to make an independent and de novo penalty determination, but rather to independently reweigh the evidence of aggravating and mitigating circumstances and then to determine whether, in the judge's independent judgment, *the weight of the evidence supports the jury verdict.* [Citations.]" (*People* v. *Lang* (1989) 49 Cal.3d 991, 1045 [264 Cal.Rptr. 386, 782 P.2d 627], original italics.) The court, in so ruling, must set forth its reasons with sufficient particularity to allow effective appellate review. (*People* v. *Heishman* (1988) 45 Cal.3d 147, 199-201 [246 Cal.Rptr. 673, 753 P.2d 629]; *People* v. *Rodriguez, supra*, 42 Cal.3d at pp. 793-794.)

 Here, the record reveals that the trial court was aware of and executed its responsibilities under section 190.4, subdivision (e), with particular care and attention to detail. The court prefaced its analysis by expressly noting that its duty was "to consider each of the circumstances in aggrava-

tion and mitigation independently." The court then proceeded to review each of the statutory penalty factors and special mitigating factors that had been read to the jury, cataloging the evidence that was pertinent to each, stating its views as to the direction in which the evidence cut, and ultimately concluding that "the jury's findings and verdicts are not only supported by the weight of the evidence, but the Court in its independent review of all the evidence finds the jury verdicts and findings are not contrary to the law or evidence."

The judge placed primary aggravating weight on the circumstances of the crime (§ 190.3, factor (a)), which evidenced a particularly cold-blooded and calculated killing, and the presence of prior criminal activity involving the use of violence (factor (b)), as evidenced by the two San Bernardino homicides. The court found that the expert psychiatric evidence offered by defendant did not show that the crimes were committed while defendant was under the influence of extreme mental or emotional disturbance (factor (d)) or that his capacity to appreciate the criminality of his acts or conform his behavior to the requirements of law was impaired by mental disease or defect (factor (h)). Nevertheless, the court considered the latter to be a mitigating factor. The court found factors (c) (prior felony convictions), (e) (victim participation or consent), (f) (moral justification), (g) (duress), (i) (the age of defendant), and (j) (whether defendant was an accomplice) to be inapplicable. With respect to factor (k) (any other circumstance which extenuates the gravity of the crime), the court found the special factors requested by defendant to be mitigating.[13]

Defendant correctly observes that the trial judge mislabeled factor (c) (the absence of prior felony convictions) as "inapplicable." The judge and jury were, of course, free to view the absence of prior felony convictions as a factor in mitigation. (*People* v. *Crandell* (1988) 46 Cal.3d 833, 884-885 [251 Cal.Rptr. 227, 760 P.2d 423].) However, the court was plainly aware that defendant had not suffered a prior felony conviction and clearly did not misconstrue factor (c) to be a factor in aggravation. (Cf. *People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1186 [259 Cal.Rptr. 701, 774 P.2d 730].) Moreover, the judge placed primary emphasis on the brutal and cold-blooded nature of the murders. The court's statement of decision makes clear that it did not consider the issue of penalty to be a close one. Thus, any error in the trial court's analysis with respect to this one penalty factor was harmless by any applicable standard. (*People* v. *Hamilton, supra*, 48 Cal.3d at pp. 1186-1187; *People* v. *Brown* (1988) 46 Cal.3d 432, 462 [250 Cal.Rptr. 604, 758 P.2d 1135].)

---

[13] See footnote 12, *ante*, page 969.

CONCLUSION

We find no prejudicial error at either the guilt or penalty phases of defendant's trial. The judgment is affirmed in its entirety.

Lucas, C. J., Panelli, J., Eagleson, J., and Kennard, J., concurred.

**MOSK, J.**—I concur in the judgment. After review, I have found no error warranting reversal.

I write separately, however, to express my strong disapproval of serious police misconduct during the interrogation prior to defendant's confession: in an effort to secure a statement, the officers deliberately played on defendant's religious beliefs in violation of principles underlying the First Amendment to the United States Constitution and article I, section 4, of the California Constitution.

Prior to trial, defendant moved to suppress his confession. One of his claims was that the statement was involuntary because it was obtained by the exertion of improper influence by the police, viz., by playing on his religious beliefs. The court denied the motion, determining, inter alia, that the confession was voluntary beyond a reasonable doubt.[1]

The law that is applicable here is clear and well settled.

An involuntary confession is inadmissible under the due process clauses of both the Fourteenth Amendment to the United States Constitution (e.g., *Jackson* v. *Denno* (1964) 378 U.S. 368, 385-386 [12 L.Ed.2d 908, 84 S.Ct. 1774, 1 A.L.R.3d 1205]) and article I, sections 7 and 15, of the California Constitution (e.g., *People* v. *Ditson* (1962) 57 Cal.2d 415, 438-439 [20 Cal.Rptr. 165, 369 P.2d 714] [decided under the predecessor of Cal. Const., art. I, § 15]). (See, e.g., *People* v. *Boyde* (1988) 46 Cal.3d 212, 238 [250 Cal.Rptr. 83, 758 P.2d 25], affd. *sub nom. Boyde* v. *California* (1990) 494 U.S. 370 [108 L.Ed.2d 316, 110 S.Ct. 1190].)

A confession is involuntary under the federal (e.g., *Malloy* v. *Hogan* (1964) 378 U.S. 1, 7 [12 L.Ed.2d 653, 84 S.Ct. 1489]) and state (e.g., *People*

---

[1] The court applied the reasonable-doubt standard evidently in reliance on *People* v. *Jimenez* (1978) 21 Cal.3d 595, 602-609 [147 Cal.Rptr. 172, 580 P.2d 672]. But since the crimes herein were committed after June 9, 1982, the effective date of article I, section 28, subdivision (d), of the California Constitution (*People* v. *Smith* (1983) 34 Cal.3d 251, 257-263 [193 Cal.Rptr. 692, 667 P.2d 149]), *Jimenez* did not govern, and the applicable standard was preponderance of the evidence. (*People* v. *Markham* (1989) 49 Cal.3d 63, 71 [260 Cal.Rptr. 273, 775 P.2d 1042].)

v. *Trout* (1960) 54 Cal.2d 576, 583 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418]) guaranties of due process when it "was ' "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence[]" ' " (*Hutto v. Ross* (1976) 429 U.S. 28, 30 [50 L.Ed.2d 194, 97 S.Ct. 202] (*per curiam*)). (See *People* v. *Berve* (1958) 51 Cal.2d 286, 290 [332 P.2d 97].) "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' . . . ." (*Colorado* v. *Connelly* (1986) 479 U.S. 157, 167 [93 L.Ed.2d 473, 107 S.Ct. 515].) That is the law under the Fourteenth Amendment. (*Ibid.*) It is also the law, in my view, under article I, sections 7 and 15, of the California Constitution.

A confession is "obtained" by governmental conduct within the meaning of the federal and state due process guaranties if and only if conduct and confession are linked, as it were, by "proximate" causation. This is certainly true for the federal right. The requisite causal connection must be more than "but for": causation-in-fact is insufficient. (*Hutto* v. *Ross, supra,* 429 U.S. at p. 30 [50 L.Ed.2d at p. 197] (*per curiam*).) "If the test was whether a statement would have been made but for the law enforcement conduct, virtually no statement would be deemed voluntary because few people give incriminating statements in the absence of some kind of official action." (*U.S.* v. *Leon Guerrero* (9th Cir. 1988) 847 F.2d 1363, 1366, fn. 1.) The foregoing is also true for the state right. It is the rule in California that the conduct must be "a *motivating* cause of the confession." (*People* v. *Brommel* (1961) 56 Cal.2d 629, 632 [15 Cal.Rptr. 909, 364 P.2d 845], italics added; accord, *People* v. *Hogan* (1982) 31 Cal.3d 815, 838 [183 Cal.Rptr. 817, 647 P.2d 93].) Manifestly, the rule is rooted in principles that are of state constitutional dimension.

Finally, on appeal the trial court's determination of voluntariness is subject to independent review. (E.g., *Davis* v. *North Carolina* (1966) 384 U.S. 737, 741-742 [16 L.Ed.2d 895, 898, 86 S.Ct. 1761] [reviewing federal constitutional claim]; *People* v. *Sanchez* (1969) 70 Cal.2d 562, 571-572 [75 Cal.Rptr. 642, 451 P.2d 74] [apparently speaking of review of both federal and state constitutional claims].)

I now turn to the case at bar. It is plain that the police exerted improper influence on defendant during interrogation in an attempt to obtain a confession. As the facts set out by the majority demonstrate, the officers played on defendant's religious beliefs, and did so in a deliberate fashion. Such conduct was altogether improper under the First Amendment and—separately and independently—under article I, section 4, of the California Constitution. In *People* v. *Adams* (1983) 143 Cal.App.3d 970 [192 Cal.Rptr. 290], the Court of Appeal put it thus: "Religious beliefs are not matters to

be used by governmental authorities to manipulate a suspect to say things he or she otherwise would not say. The right to worship without fear is too precious a freedom for us to tolerate an invasion and manipulation by state officials of the religious beliefs of individuals, including those accused of crime." (*Id.* at p. 989.)

The majority are evidently of the opposite view. To be sure, they agree that the police may not play on religious beliefs, stating that "the tactic of exploiting a suspect's religious anxieties has been justly condemned" and citing to *People* v. *Adams, supra,* 143 Cal.App.3d 970. (Maj. opn., *ante,* at p. 953.) But they disagree that the officers in this case acted improperly: "none of the police comments here appear to have been calculated to exploit a particular psychological vulnerability of defendant; no acute religious anxiety or sense of guilt was apparent from prior questioning . . . ." (*Ibid.*) Perhaps no religious sensitivity was evident earlier in the interrogation. But it plainly *became* evident in its course. And as soon as it did, it was purposely exploited.

Although the police exerted improper influence on defendant by deliberately playing on his religious beliefs, on this record the confession cannot be held to have been *obtained* by the exertion of such influence. I recognize that the evidence allows an inference that but for the officers' misconduct, defendant would not have confessed. But it simply does not allow an inference of a causal connection that is more direct and substantial. And as explained above, causation-in-fact is insufficient.

Therefore, after independent review, I conclude that the trial court did not err when it determined that defendant's confession was voluntary beyond a reasonable doubt.

Accordingly, having found no error on this point—and no error on any other warranting reversal—I concur in the judgment.

Broussard, J., concurred.

Appellant's petition for a rehearing was denied February 14, 1991.