[No. E009347. Fourth Dist., Div. Two. Dec. 22, 1992.]
THE PEOPLE, Plaiantiff and Respondent, v.
STEVEN DOMINGUEZ et al., Defendants and Appellants.

**COUNSEL**

James L. Crowder and Robert F. Howell, under appointments by the Court of Appeal, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Pat Zaharopoulos and Garrett Beaumont, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**DABNEY, J.**—Defendants appeal their convictions of first degree residential robbery (Pen. Code, § 211). Special allegations that a principal was

armed with a firearm in the commission of the offense (Pen. Code, § 12022, subd. (a)(1)) were found true as to each defendant, and the jury found true allegations that defendant Dominguez personally used a firearm (Pen. Code, §§ 1203.06, subd. (a)(1), 12022.5, subd. (a)).

FACTS

### 1. *The Prosecution's Case*

The victim, Miguel Martinez, shared an apartment in Ontario with five other men. Martinez was home alone on the afternoon of August 9, 1990, talking on the telephone. Martinez answered a knock on the door with the telephone still in his hand. Defendant Reil forced her way inside when Martinez opened the door. Although Martinez protested and asked Reil to leave, she told Martinez that she knew "Mario," one of the residents of the apartment, and that "Mario" had told her she could stay at the apartment if she needed to. Reil also said she wanted to talk to "Mario" because someone who lived at the apartment had given her a venereal disease. No one named "Mario" lived at the apartment.

Martinez put down the telephone and tried to get Reil to leave. Reil walked around the apartment, picking up and putting down glasses and other objects. She grabbed the telephone and spoke into it briefly. She then threw the receiver, disconnecting it. As Martinez argued with her, Reil became angry and picked up a glass ashtray. She told Martinez not to call the police, and she threatened to break all the glass in the apartment to "get even." Martinez told Reil to get out and moved to take the ashtray away from her. Reil yelled loudly and defendant Dominguez entered holding a gun in his right hand. Reil asked Martinez, "Why do you want to hurt me?" and Dominguez asked Martinez why he was "beating up" Reil.

Martinez asked both defendants to leave. Dominguez pointed his pistol at Martinez while he and Reil "argued." Dominguez went to the television, grabbed the video cassette recorder (VCR) with his left hand and started to disconnect the VCR. Reil went in the direction of the bedrooms. Martinez saw Dominguez disconnect one of the cables connecting the VCR to the television. Dominguez put down his gun while disconnecting the VCR and Martinez ran out of the apartment.

Martinez later saw defendants in a truck with a third person driving away from the apartment. When Martinez returned to the apartment, the VCR was missing from the living room, and other electronic components were missing from the bedroom where Reil had gone. A record player was missing from

another bedroom. One of the bedroom windows had been forced open and the blinds were damaged.

Other evidence at trial established that Juan Torres, the only other roommate present at the apartment that day, had left approximately 15 minutes before Reil knocked on the door. In addition, when Reil was arrested and booked, she was asked if she was sick or had an injury. She said no.

### 2. *Defense Case*

Michelle G., defendant Reil's 13-year-old niece, testified for the defense. She stated she was with defendants in the pickup truck on August 9, 1990. She testified she went to the door with Reil and Martinez invited them in and gave them Kool-Aid. Reil and Martinez conversed in Spanish, mentioning the name "Mario." Martinez told them "Mario" was not there. The telephone rang and Martinez answered it. Martinez told Reil that "Mario" was on the phone and gave Reil the receiver. Both Reil and Martinez spoke on the telephone before Martinez hung up. Both Reil and Michelle used the bathroom. Michelle started to watch television when Martinez suddenly grabbed Reil's arm. Reil was screaming and told Michelle to fetch Dominguez from the truck. Michelle went to the truck to summon Dominguez. Michelle thereafter stayed at the truck with Reil's three-year-old daughter. Dominguez went into the apartment. Both defendants came out a few minutes later. They were not carrying any electrical appliances when they came out of the apartment.

Dominguez's mother testified he is left-handed.

### DISCUSSION

Defendants raise several contentions on appeal, which will be treated seriatim.

### 1. *Sufficiency of the Evidence*

■ Defendants contend the evidence was not sufficient to support a conviction for robbery, on the theory that the property was not taken from Martinez's "immediate presence" because he managed to escape from the apartment before defendants succeeded in carrying away his property.

■ Property is "in the [immediate] presence of a person, in respect to robbery, which is so within his reach, inspection, observation, or control, that he could, if not overcome by violence or prevented by fear, retain his

possession of it. [Citations.]" (*People* v. *Webster* (1991) 54 Cal.3d 411, 440 [285 Cal.Rptr. 31, 814 P.2d 1273], internal quotation marks omitted.) ▮ Here, Dominguez disconnected the cable connecting the VCR to the television while Martinez was in his own apartment, approximately two yards away. The evidence was sufficient to support a finding that, but for defendants' use of force or fear (threatening with a glass ashtray and pointing a pistol at Martinez), Martinez could have taken steps to exercise physical control over his property. (Cf. *People* v. *Hayes* (1990) 52 Cal.3d 577, 627 [276 Cal.Rptr. 874, 802 P.2d 376]; *People* v. *Webster, supra,* 54 Cal.3d at p. 440.)

Defendant argues that *asportation* of the property, rather than the "beginning" of a "taking," is required to be accomplished in the "immediate presence" of the victim, by means of force or fear. He contends that the VCR was still "attached" to the premises by a cable when the victim left the apartment, and that the VCR was therefore not "taken" or "asported" from his immediate presence.

In *People* v. *Lavender* (1934) 137 Cal.App. 582 [31 P.2d 439], the defendants lured a hotel clerk away from the desk by a ruse; they tied him up in a room, forced him to give them the combination to the cash register, returned to the office and rifled the register. The court held that the fact that the victim had been detached from physical presence of the property by a trick or device should not avail defendants of the argument that the property was not taken from his immediate presence. (*Id.* at p. 591.) ▮ Thus, "[o]ne commits robbery when, with intent to rob, he uses peaceful means to move the victim away from a place where the victim could physically protect the property, then employs force or fear upon the victim in order to make good the theft or escape. *The act of 'taking' begins when the separation of the victim from his or her property occurs,* and it continues through the forcible consummation. Hence, the defendant may be found guilty of a 'taking' which is *both* from the victim's 'person or immediate presence' *and* 'by means of force or fear.' (§ 211.)" (*People* v. *Webster, supra,* 54 Cal.3d at pp. 441-442. First italics added; remaining italics in original.)

▮ Here, the "taking" was begun in Martinez's "immediate presence," when he was separated from his property by the "force or fear" itself, rather than by ruse. Defendants do not contend they did not complete the taking by a sufficient asportation: They successfully carried the property away. Defendants should not be heard to complain that they so effectively terrorized the victim that he abandoned his property before they could carry it away. (Cf. *People* v. *Sylvis* (1925) 72 Cal.App. 632, 639 [237 P. 802] [victim ran away to escape sexual attack, leaving her purse behind. Defendant *later* discovered the purse and appropriated money; held, larceny only] with *People* v. *Stevens*

(1903) 141 Cal. 488, 490 [75 P. 62] [robber takes victim's trousers from bed—larceny. Victim retakes them but, menaced with a razor, drops them and flees—robbery].) To hold otherwise would permit robbers to avoid conviction by the expedient of having victims place their property on the ground and depart before the robbers pick it up. This is not the law. (See *People* v. *Hays* (1983) 147 Cal.App.3d 534, 541 [195 Cal.Rptr. 252] [taking from immediate presence supported where violent appearance of defendant forced victim to flee, abandoning property]; *People* v. *Miramon* (1983) 140 Cal.App.3d 118, 123 [189 Cal.Rptr. 432] [property taken from victim's immediate presence where victim returned home to find defendant burglarizing apartment; defendant pulled knife and victim fled; defendant later found with victim's property].) Substantial evidence supported the conviction of robbery.

### 2. Instructions on Immediate Presence

■ Defendants next contend the trial court committed prejudicial error in giving a disapproved instruction on the meaning of "immediate presence." The court instructed the jury that "The act of robbery is deemed to have occurred in the victim's presence as long as the victim perceived any overt act connected with the commission of the offense. An overt act is defined as an open act from which criminality may be implied."

In *People* v. *Hayes, supra,* 52 Cal.3d 577, decided shortly after the trial in this case, the California Supreme Court disapproved a similar "overt act" instruction. There, although the evidence showed the victim was fatally assaulted, and that this "overt act" of robbery unquestionably occurred in the victim's presence, the property taken was in another room 107 feet away. "Immediate presence" with respect to robbery has to do with dominion and control over property as well as receipt of some threat or assault. The "overt act" instruction in *Hayes* could have improperly permitted the jury to find a robbery without there having been any property taken from the "immediate presence" of the victim; the instruction was therefore erroneous.

Here, any error in the instruction was harmless beyond a reasonable doubt. There is no question that the victim's property was in his immediate presence, and that he could have asserted control over it but for defendants' exercise of force or fear to prevent his doing so. Both the assault and the taking of the property were accomplished within the victim's "immediate presence."

### 3. Prosecutor's Closing Argument

■ Defendants next contend the prosecutor committed prejudicial misconduct in his closing argument by arguing facts and theories not supported by the evidence.

Counsel for defendant Dominguez had argued that Reil could only have entered the apartment for the genuine purpose of confronting "Mario," because there was no credible evidence that defendants would have planned such a sloppy robbery in advance. Among other things, he argued Reil's speaking on the telephone and screaming would only have attracted attention of other persons and was inconsistent with an intent to steal.

Reil's counsel argued that Michelle's testimony showed she was familiar with the inside of the apartment, and that her story of an innocent visit to the apartment was therefore more credible than Martinez's version of events. He further urged that robbers do not take 13-year-old children with them. He also suggested other possible "scenarios" for the incident: First, defendants came to the apartment, but did not take any property. The property may have been taken by unknown strangers who entered the apartment and stole the electronic equipment while Martinez remained away; Martinez blamed the theft on defendants because they had been at the apartment. Second, Martinez stole the property himself, because Reil's presence at the apartment provided him with a convenient scapegoat. Third, Martinez made up the entire story. Defense counsel also suggested that perhaps defendants did not form the intent to steal until after Martinez left the apartment, and therefore at most committed larceny.

In answer, the prosecutor contended that robbers and burglars have been known to take children with them and use the children to aid in stealing. He suggested that perhaps defendants had seen the other tenant depart 15 minutes before Reil entered the apartment and they were not expecting to find anyone at home. Reil could then have made up a spur-of-the-moment ruse about a fictitious "Mario" to occupy the victim in the front room while entry may have been forced in the bedroom window. Reil's loud shouting could have served the purposes of alerting a thief in the bedroom that someone was at home and/or summoning Dominguez's aid with the gun.

Defense counsel objected to any suggestion that defendants had originally planned a burglary, and the court instructed the jury there was no evidence that the incident had started out as a burglary. Defendants continue to urge, however, that the prosecutor's argument was misconduct because it was based on facts outside the record.

There was no prejudicial misconduct. Defense counsel had theorized, without any support in the record, that strangers may have stolen the property. They also propounded several other theories for the incident, all predicated on the truth of Reil's claim she went to the apartment to confront "Mario" about venereal disease she had contracted and on the assertion that

defendants would not have brought 13-year-old Michelle with them if they intended to commit a "stupid robbery" in broad daylight.

The prosecutor was permitted to counter these defense assertions. He was entitled to suggest an explanation for Michelle's familiarity with the interior of the apartment notwithstanding the fact that the victim never saw her in the apartment. The evidence showed that one of the roommates left the apartment about 15 minutes before Reil entered, the bedroom window was forced, property was taken from more than one bedroom, and Martinez saw at least three people departing in the pickup truck. Martinez was away from the apartment for a space of time and did not observe what defendants did at every moment. Reil's admittedly bizarre behavior might permit the inference she was alerting other participants in the theft to the fact that the victim was at home. All the defense theories hung upon Reil's story that she went to the apartment to confront "Mario" about venereal disease, but there was in fact no "Mario" who lived at the apartment and no showing Reil had ever had venereal disease. The prosecutor was entitled to rebut the defense arguments by suggesting other reasonable inferences that might be drawn from the evidence. (*People* v. *Kelly* (1990) 51 Cal.3d 931, 967-968 [275 Cal.Rptr. 160, 800 P.2d 516].)

### 4. *Griffin Error*

Defendants argue that the prosecutor also committed prejudicial misconduct by commenting on defendant Reil's failure to testify. In closing argument, the prosecutor stated: "Do we have any other evidence that Debbie Reil ever had venereal disease? [Reil's attorney] is in a unique position to obtain that evidence for you, if it exists . . . ." The contention that the comment constituted *Griffin* error (*Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]) is without merit. As the prosecutor made clear when he resumed his argument, he was not commenting on defendant Reil's failure to testify, but merely pointing out that defendant could have easily produced medical testimony to establish the fact, if it were true. It is not improper to comment on the state of the evidence, including the defendant's failure to call logical witnesses or to produce material witnesses. (*People* v. *Kelly, supra*, 51 Cal.3d at p. 967.) The jury was also properly instructed not to draw any adverse inference from the failure of any defendant to testify.

### 5. *Effective Assistance of Counsel*

Defendant Dominguez next urges that he was deprived of the effective assistance of counsel because his trial attorney failed to investigate a

possible witness who would have testified that Dominguez had injured his right hand before the robbery, rendering it unlikely he would have pointed a pistol at Martinez with his right hand. Dominguez was unsuccessful below in moving for a new trial on the basis of alleged "newly discovered evidence" with respect to the injury. He now claims counsel's performance was constitutionally deficient in failing to investigate this defense.

Defendant cannot here demonstrate that counsel's performance fell below objectively reasonable standards of professional conduct. (See *In re Fields* (1990) 51 Cal.3d 1063, 1069-1070 [275 Cal.Rptr. 384, 800 P.2d 862].) Although there was one reference in a police report that Dominguez's arm had been in a sling, that reference did not relate that statement to any dates connected with the robbery. Defendant did not tell counsel of the injury before or during trial. In any event, defendant has failed to show any prejudice. He did not allege in support of the motion for new trial that the injury to his right arm (on July 27, 1990) made it impossible for him to hold a gun in his right hand on August 9. Besides, defendant was left-handed. It is not reasonably probable a different result would have been obtained in the absence of this alleged error. (*In re Fields, supra*, at pp. 1078-1079.)

### 6. *Conviction as an Aider and Abettor*

Defendant Reil argues the evidence was insufficient to support her conviction of robbery as an aider and abettor. She is wrong. There was substantial evidence to support a conclusion she knew of Dominguez's unlawful purpose and intended to aid, encourage or facilitate the commission of the robbery. (See *People* v. *Beeman* (1984) 35 Cal.3d 547, 562 [199 Cal.Rptr. 60, 674 P.2d 1318].)

Reil may have helped Dominguez enter the apartment by forcing her way into the apartment. The evidence supported the inference that her entry was pretextual because the story about contracting venereal disease from "Mario" was false. Reil may have intentionally disconnected the telephone immediately before Dominguez's arrival. Reil was present when Dominguez entered with the gun. When he started to disconnect the VCR, she went to the bedroom, from which other property was taken. With knowledge that Dominguez was armed, Reil drove away with him in the truck. Substantial evidence thus supports the view that Reil, with knowledge that Dominguez was armed, helped him take and carry the property away. Reil was properly convicted as an aider and abettor.

### 7. *Pinpoint Instruction on When Intent Arose*

Defendants assert their counsel were constitutionally ineffective for failing to request a pinpoint instruction on intent, focusing on when the

intent to steal arose. One of the defense theories was that, if defendants did not form the intent to steal until after the application of force, they were not guilty of robbery. The argument is without merit; the trial court did instruct the jury "[i]f the defendant did not intend to commit a theft at the time he committed the acts which caused the victim to be in fear, the defendant is not guilty of robbery."

### 8. *Sua Sponte Instruction on Grand Theft*

Finally, defendants contend the trial court erred in failing to instruct sua sponte on a lesser included offense of grand theft. Defendants argue that error in failing to instruct on a lesser included offense "cannot be cured by weighing the evidence and finding it not reasonably probable that a correctly instructed jury would have convicted the defendant of the lesser included offense," citing *People* v. *Ramkeesoon* (1985) 39 Cal.3d 346, 352 [216 Cal.Rptr. 455, 702 P.2d 613].) In *Ramkeesoon*, as here,. the question of lesser included offense instructions was important because there was some evidence to suggest the intent to steal did not arise until after the victim was subjected to force or fear. (*Id.* at p. 351.)

Defendants' reliance on *Ramkeesoon* is misplaced, however. The failure to give instructions on a lesser offense of theft there was found prejudicial because the jury was put to an "unwarranted all-or-nothing choice"—it could find defendant guilty of robbery, or it would have to find him not guilty, although the evidence could support a finding that he was guilty of some lesser offense. Here, the court did instruct on a lesser included offense of petty theft. The jury was clearly told that if defendants did not form the intent to steal until after the force or fear had been applied, defendants could not be found guilty of robbery. The instructions and verdicts given thus required the jury to confront the identical after-formed intent issue that would have been involved in instructing on grand theft; we will not lightly presume the jury disregarded the court's instructions. (*People* v. *Turner* (1990) 50 Cal.3d 668, 692-693 [268 Cal.Rptr. 706, 789 P.2d 887].) The only difference defendants suggest would be the value of the property taken, as to which there was no explicit evidence in the record. Under the instructions given, the jury was not put to an improper all-or-nothing choice, but necessarily rejected the theory of after-acquired intent when it found defendants guilty of robbery rather than petty theft. (*Id.* at p. 693; see *People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913].) Any error in failing to instruct on the additional offense of grand theft was harmless. (*People* v. *Turner, supra,* 50 Cal.3d at p. 693.)

## Disposition

Defendants' assignments of error are without merit. The judgments are affirmed.

Ramirez, P. J., and Timlin, J., concurred.

Appellants' petition for review by the Supreme Court was denied March 25, 1993.