Filed 4/10/25  P. v. Guan CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>MIN JIAN GUAN,<br><br>     Defendant and Appellant. | A168412<br><br><br>(San Francisco County Super. Ct. Nos. CRI 20007040, SCN233216) |

A jury convicted defendant Min Jian Guan of first degree murder for killing his housemate Yu Qin Sun, and the trial court sentenced him to 25 years to life.  Guan contends the court erred in three ways:  (1) by finding Guan understood—and thus knowingly waived—his *Miranda*[1] rights; (2) by giving standard instructions implying that the jury could find him guilty of second degree murder only if he faced provocation that not only led him, but would have led a reasonable person, to act in the heat of passion; and (3) by denying his request for new counsel without holding a *Marsden*[2] hearing.  Guan also contends, and the People agree, that the abstracts of judgment must be corrected.  We affirm the judgment but remand for correction of the abstracts.

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

[2] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

1

# BACKGROUND

*Evidence at Trial*

Sun, age 79, and Guan, then age 60, rented rooms in a house in San Francisco. They often argued: Sun's night-time coughing kept Guan awake; she found him unduly noisy; and he thought she stole his eggs. One evening, a fellow tenant named Chen heard a noise and found the two arguing in the kitchen by an overturned trash can that Sun said Guan had kicked over. Guan was berating Sun, who looked fearful. Worried that Guan would hurt her, Chen stepped between them.

On the afternoon Sun was killed, she was in her room attending a class by Zoom on her iPad. During the class, which began at 4:00 p.m., the class leader saw Sun move off camera and heard her say in Mandarin, "What are you doing?" The class leader and a student heard Sun scream and her body fall. They heard a "suffering . . . moaning" sound and gasping for air; they also heard blows. Finally, they saw—but only from the waist down—someone in gray sweatpants and blue slippers close Sun's iPad. The class leader's son called 911.

Upon arriving at the house, responding officers encountered Guan, who was wearing gray sweatpants and blue slippers. Inside the house, the officers smelled burnt alcohol. After determining that Guan spoke Cantonese rather than English, the officers requested the dispatch of a Cantonese-speaking officer, leading to the arrival of Officer Janning Ma, a certified Cantonese translator. When Ma asked Guan if he lived at the house, Guan said he did and no one else was there at the time. After officers mentioned someone having called an ambulance, Guan said, "I don't know. I just got back." Ma told Guan to go up to his room while the officers searched the house.

The officers found Sun's body on the floor of her room. Her face was red and burnt, her hair was charred, and she had head and neck injuries. The room smelled of rubbing alcohol.

The officers brought Guan downstairs and detained him, noting he had changed into black sweatpants. They found no one else in the house. Police later recovered from Guan's room a baseball bat and a pair of gray sweatpants, both bloodstained; a half-empty bottle of rubbing alcohol; and a lighter. Elsewhere in the house, they noted that both a smoke detector and a carbon monoxide detector had been disabled or removed.

The officers took Guan to a police station and, as detailed below, gave him *Miranda* warnings in Cantonese to read from a printed card and orally via Officer Ma. They then questioned him as Ma translated.

Guan said he did not know why he was being questioned. He described leaving the house at 7:30 a.m. that day, staying out until 3:00 or 4:00 p.m., and then returning to make soup, which he was doing when the officers arrived. Guan said he did not see anyone in the house when he got home and had not seen Sun, in particular, all day.

Guan admitted having disagreements with Sun; he described his trouble sleeping because she coughed all night. But he said he had not quarreled with her in a while. When a detective said they had a witness who had seen Guan in Sun's room, he said they "were talking nonsense"; he denied having ever entered her room. Asked if he had ever had physical contact with Sun that could result in "getting stuff on" his clothes, Guan said he tried to avoid her, as she seemed sick. Asked if there was any reason Sun's blood would be on his pants, Guan replied, "My clothes do not have her blood."

Guan acknowledged owning lighters and a baseball bat, which he swung in the yard for exercise. Asked why he had changed his pants, he said

3

he did so once he got home about 4:00 p.m.  Asked if he had hit Sun with his bat, he said he had not seen her and asked why he should hit her.  A detective said Sun's blood was on his bat, and Guan reiterated he had not seen her; told that Sun's blood was on his pants, he said, "No, you are making it up." Asked how Sun could have been attacked in her room without him noticing, Guan insisted he had been watching TV in his room upstairs and had no idea what happened.

An analyst found two DNA profiles on the handle of the baseball bat and one DNA profile on the barrel of the bat.  Guan's DNA matched one DNA profile on the bat handle, which contributed one percent of the DNA collected; Sun's DNA matched the other profile found on the handle, which contributed 99 percent of the DNA collected.  Sun's DNA also matched the lone DNA profile found in the blood on the barrel of the bat, with an exceedingly small chance of error.  Blood on the gray sweatpants was also consistent with Sun's DNA; a DNA sample from the pants' waistband held DNA consistent with both hers and Guan's.  Sun's autopsy revealed injuries consistent with someone having hit her in the back of the head with a bat, compressed her neck and pressed her mouth shut, compressed her torso and fractured her ribs (in a way not consistent with the effects of resuscitation efforts), and burnt her skin while she was still alive.

### Verdict and Sentencing

Charged with first degree murder (Pen. Code,[3] § 187, subd. (a)) and with injuring an elder over 70 (§ 368, subd. (b)(1)), Guan was tried before a jury, which found him guilty of both counts.[4]  When he appeared for

---

[3] All undesignated statutory references are to the Penal Code.

[4] During trial, counsel expressed a doubt about Guan's competence, the court suspended proceedings, and another department held a competency trial.  The question of competence focused on Guan's represented belief that

4

sentencing, Guan requested new counsel.  In a colloquy set forth below, the court denied his request.  It sentenced him to 25 years to life for murder and imposed but stayed the sentence on the elder abuse count, which rested on the same acts (§ 654).

## DISCUSSION

### I.  The Court Did Not Err in Finding a Valid *Miranda* Waiver

Guan contends the trial court prejudicially erred when, after holding an evidentiary hearing (Evid. Code, § 402, subd. (b)), it denied his motion to exclude his statements to police based on a *Miranda* violation.  Guan contends he did not understand his *Miranda* right to be provided a lawyer at no cost if he could not afford one and thus could not waive that right.[5]  We disagree.

A suspect can validly waive *Miranda* rights only with " 'full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it,' " and a court can find a valid waiver only if " 'the "totality of the circumstances surrounding the interrogation" reveals . . . the requisite level of comprehension.' "  (*People v. Smith* (2007) 40 Cal.4th 483, 501–502.)  The People must prove a waiver's validity by a preponderance of the evidence.  (*People v. Kelly* (1990) 51 Cal.3d 931, 947.)  If, as here, an

---

the DNA analyst who testified at trial had previously testified at Guan's preliminary hearing that the blood found at the scene "was fish blood, the kind that you eat, and not human blood. . . ."  The jury found Guan competent, and his criminal trial resumed.  Guan raises no issues on appeal about the competency trial.

[5] In the hearing before the trial court, Guan claimed a *Miranda* violation on a different basis:  that he had not waived his right to have an attorney present but had in fact requested one.  He does not renew that claim on appeal.

interaction is recorded, we treat the facts as undisputed and review the *Miranda* issue independently. (*People v. Linton* (2013) 56 Cal.4th 1146, 1177.)

Guan does not dispute that he both read and was orally advised of his *Miranda* rights in Cantonese and stated that he understood and waived those rights before answering the officers' preliminary questions. The only issue now concerns whether Guan in fact understood his right to have a lawyer appointed for him free of charge if he could not afford one, making any apparent waiver of that right invalid.

Before Sergeants Graves and Discenza began their questioning, Officer Ma had Guan read aloud each right from a pre-printed card that listed the *Miranda* rights in Cantonese. After Guan read each right, Ma paraphrased and explained the right in more colloquial Cantonese.[6] The transcript of the exchange concerning Guan's right to counsel includes the following:

> "[Guan, reading (*Can.*)[7]: If you cannot afford a lawyer, one will be appointed for you free of charge if you wish.
>
> "[Ofc. Ma (*Can.*)]: That is, before we ask you anything, if you need to get a lawyer, to discuss it first, you can get a lawyer. If you have no money to hire a lawyer, the government will hire a lawyer for you. Do you understand?
>
> "[Guan (*Can.*)]: Yes.
>
> "[Ma (*Eng.*)]: Okay. He understands his rights.
>
> "[Graves]: Okay.

---

[6] At the section 402 hearing, the court listened to a recording of the advisement and read a transcript with the Cantonese exchanges translated into English. Officer Ma also testified.

[7] We identify statements by Officer Ma or Guan as Cantonese (*Can.*) or English (*Eng.*); Sergeants Graves and Discenza spoke only in English.

"[Guan (*Eng.*)]: No, no money.

"[Ma (*Can.*)]: I know. We are not asking whether you have money. We are asking whether you want to talk to us about what happened today.

"[Guan (*Can.*)]: Yes, I can talk about it.

"[Ma (*Eng.*)]: So I just asked him, money is not the issue, would he like to speak to us of what happened today? And he says yes."

Sergeant Graves then asked Guan for basic identifying information, after which Sergeant Discenza asked Graves to orally advise Guan of his *Miranda* rights in English with Officer Ma directly translating. After Discenza stated, "We just want to clarify" and Graves echoed, "want to clarify," Ma translated, "He wants to read it to you again, OK?" This exchange ensued:

"[Sgt. Graves]: You have the right to the presence of an attorney before and during any questioning. Do you understand?

"[Ofc. Ma (*Can.*)]: Before we ask you anything, you have the right to be accompanied by a lawyer. Do you understand?

"[Guan (*Can.*)]: I have no money. What lawyer can I hire?

"[Ma (*Can.*)]: It has nothing to do with money. If you require, we can hire a lawyer for you. Do you understand?

"[Guan (*Can.*)]: Should I compensate?

"[Ma (*Can.*)]: I am not clear about this. If you have no money, the government will hire a lawyer for you. Free of charge. I am just asking you now if you understand?

"[Guan (*Can.*)]: I don't know what he meant.

"[Ma (*Can.*)]: It means that before we ask you anything, if you need, if you require, you have the right to be accompanied by a lawyer. Do you understand?

"[Guan (*Can.*)]:  Yes.  I don't need one."

Sergeant Discenza then asked Officer Ma what else Guan had been saying.  Ma explained, "So he first responded with that I don't have any money to hire a lawyer.  He didn't quite understand that he has the right to an attorney . . . . [¶] [Discenza]:  That we will provide him one . . . [¶] [Ma]:  Yeah I explained that to him and he says he doesn't need one."

Dissatisfied, the officers advised Guan again:

"[Sgt. Graves]:  Let me say it, and then you repeat.  If you cannot afford an attorney one will be appointed for you free of charge before any questioning if you want.  Do you understand?

"[Ofc. Ma (*Can.*)]:  She said if you have no money to hire a lawyer, the government will hire one for you.  You don't have to pay.  If you need, we can hire one for you, before asking you questions.

"[Guan (*Can.*)]:  Okay yes.  Okay yes.  Okay yes.  I don't know what happened.  Why should I hire the lawyer?

"[Ma (*Can.*)]:  It means this is your right.

"[Guan (*Can.*)]:  I don't know what this is for.  Why should I hire a lawyer?

"[Ma (*Eng.*)]:  So he's saying I don't know what's going on.  Why would I need a lawyer?

"[Sgt. Discenza]:  Okay, but he understands what you said?

"[Ma (*Can.*)]:  Do you understand what I was saying?  What you say now, if needed, can be used against you in court.

"[Guan (*Can.*)]:  I don't know why you brought me here.

"[Ma (*Eng.*)]:  So he said I have no idea what's going on.  You guys brought me here.  I have no idea what's going on.

"[Discenza]:  Okay.

"[Graves]:  Okay.  Uhm—

"[Guan (*Can.*)]:  I don't know what happened.  Why should I hire a lawyer?  [*Crosstalk*] [¶] . . . [¶]

"[Ma (*Eng.*)]:  He doesn't know what's going on, why would I need a lawyer?

"[Discenza]:  He said it again and you just repeated it.

"[Ma (*Eng.*)]:  Yes."

Officer Ma then explained, "Uncle, they want to ask you some questions about what happened today."  Guan replied, "Oh," and Sergeant Graves resumed her questioning, with Ma translating.  The interview lasted about 90 minutes, during which Guan answered the officers' questions and never requested counsel.

Guan now contends that, despite having acknowledged and waived his right to counsel after reading the *Miranda* card, and despite his response to the oral re-admonitions—"Yes.  I don't need one" and "Okay yes.  Okay yes. Okay yes.  I don't know what happened.  Why should I hire the lawyer?"—he still did not understand that the government would hire a lawyer for him and he would not have to pay.  Guan asserts his references to *hiring* a lawyer cannot be reconciled with a finding that he understood that it was *the state* that would hire the lawyer and he would not have to pay.  We are not persuaded.

First, the word "hire" is translated from Cantonese, and the record does not include any associated nuances.  Moreover, Guan does not identify on appeal the specific term(s) he and Officer Ma used or discuss what the term(s) imply, if anything, about a potential obligation to pay.  While it is the People's burden to prove a valid *Miranda* waiver (*People v. Kelly*, *supra*, 51 Cal.3d at p. 947), Guan did not dispute below that he understood his

9

*Miranda* rights, instead contending that he had understood and in fact invoked his right to counsel (a contention he does not renew on appeal). The People thus had no occasion to offer evidence as to what the Cantonese term translated as "hire" suggests about the form of an attorney-client relationship and associated payment obligations, if any. Guan cannot raise a new argument on appeal hinging on that unexplored factual point. (See, e.g., *People v. Mays* (2017) 15 Cal.App.5th 1232, 1237–1238.)

More importantly, we must view the exchange as a whole. (*People v. Williams* (2010) 49 Cal.4th 405, 425 [assessing whether waiver was " 'knowing and intelligent under the totality of the circumstances surrounding the interrogation' "].) After Guan initially stated he understood his right to an attorney after reading the *Miranda* card, the officers continued to "make sure that [Guan] underst[ood]," as Sergeant Discenza emphasized, "if you cannot afford an attorney, one will be provided for you." After the initial admonition, Officer Ma repeated three additional times that a lawyer will be "appointed for you, free of charge," or that "the government" (or "we") will "hire one for you," if he wished. After the penultimate repetition, Guan's answer demonstrated his understanding: "[Ma]: . . . before we ask you anything, if you need, if you require, you have the right to be accompanied by a lawyer. Do you understand? [¶] [Guan]: Yes. I don't need one." After the third and final repetition, Guan said, "Okay yes" three times, further confirming that he had grasped the point Ma had repeatedly conveyed.

While Guan did use the word "hire" after those final two exchanges, the focus of his rhetorical questions was *the need* for an attorney rather than *the cost*: "*Why should* I hire a lawyer?" (italics added), not "*How could* I hire a lawyer?" Specifically, when Officer Ma asked the third time, "Do you understand?" Guan answered, "Yes. *I don't need one*" (italics added).

10

Similarly, in response to Officer Ma's final inquiry, Guan asked, "I don't know what happened. Why should I hire [a] lawyer?" Guan was talking about whether he *needed* a lawyer, not whether he could a*fford* one. Construing Guan's use of the word "hire" in light of his comments as a whole, we do not think the term reflects confusion about the point Officer Ma had repeatedly conveyed, and about which Guan ultimately expressed understanding and waived: his right to an attorney. Because we conclude Guan also understood his right to have an attorney provided free of charge, his *Miranda* waiver was valid.

## II. The Court Did Not Err in Instructing the Jury on Provocation

Guan criticizes the set of standard instructions on murder, manslaughter, and provocation given by the court—namely, CALCRIM Nos. 520, 521, 522, and 570. While they correctly explained the role of provocation in distinguishing murder from manslaughter, Guan contends their collective effect was to mislead the jury about its role in distinguishing murder in the first and second degrees. Reviewing de novo this claim of instructional error (*People v. Ocegueda* (2023) 92 Cal.App.5th 548, 557), we reject it.

We agree with the analyses rejecting identical challenges to the same set of standard instructions as set forth in *People v. Ocegueda, supra,* 92 Cal.App.5th 548 and *People v. Jones* (2013) 223 Cal.App.4th 995, 1001–1002, and will not repeat those analyses here. (See also *People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1331–1335 [rejecting very similar challenge to three of the four instructions at issue].) Guan offers no persuasive argument to distinguish or provide a basis to disagree with those opinions. His claim of instructional error thus fails.

### III.  The Hearing on Guan's Request Regarding New Counsel Was Sufficient, and Any Error Was Harmless Beyond a Reasonable Doubt

Guan argues the trial court abused its discretion in denying what he now contends was a *Marsden* request, made at the outset of his sentencing hearing.  (See *People v. Smith* (1993) 6 Cal.4th 684, 696 [ruling on *Marsden* motion "will not be overturned on appeal absent a clear abuse of [trial court's] discretion"].)  Guan describes the court as having "failed to hold a *Marsden* hearing," but, as set forth below, it was unclear if his request before the trial court to secure new counsel implicated *Marsden*.  In any event, he has shown no prejudicial error.

At the start of the sentencing hearing, Guan's appointed counsel informed the court that, in the courtroom that morning, Guan had "spontaneously told me that he wanted to hire a new lawyer.  I asked him if he wanted to do it before or after sentencing.  He said before."  Counsel further explained that after the verdict, Guan had also "told me he wanted to hire his friend as a lawyer."  Counsel had at that time "specifically asked him if he wanted to do it before or after sentencing for appeal, and he told me afterwards."  That postsentencing specification is why counsel had not said anything to the court.

After learning of this request "to hire" new counsel, the court asked Guan (through an interpreter) if he was prepared to proceed to sentencing with his trial counsel.  When he answered "no," the court asked, "What do you want me to do?"  Guan said, "I request that the judge appoint another lawyer for me, to defend me."  The court stated, "All right.  I want to make a finding."  Interrupting, Guan said, "from beginning to the end, she never did believe the findings of the lab technician.  And what that person said

12

formally was all false.[8]  I'm not quite sure what that person refers to. [¶] She said that the . . . jurors, they have two chances, and now she said they only have one.  Because I cannot speak English, that is why I could not communicate with you.  So I would like the Court to appoint another attorney for me, to defend me."

After the court confirmed that Guan had not previously told counsel that he wanted a new attorney for sentencing, Guan again interjected, "I only decided on that today.  Throughout the whole thing, because I could not speak English, that's why I couldn't have a different attorney.  That's why.  And because of that, the jurors found me guilty of first-degree murder and also second-degree murder.  There was nothing I could do . . . ."  Guan concluded, "Is there any proof that I killed anybody?"  The court said, "Yes," and a colloquy concerning the presented evidence of guilt ensued, in which Guan said, "The DNA was false.  The lab technician—did you believe what the lab technician said?"  The court replied, "The jury did."  Guan continued, "the blood that was found, it's not human blood, it's phony, and the blood came from fish. . . .  You don't have to believe what I say right now [¶] you can just believe what [the] lab technician said."

The court then ruled:  "All right.  I'm making a finding, Mr. Guan.  I want you to listen to me.  I've listened to you for several minutes. [¶] I'm denying your request . . . .  Something that you said a moment ago is very important to me in making this decision.  You told me . . . you decided this

---

8 By "lab technician" and "that person" Guan appears to reference the criminalist who presented blood and DNA evidence at the preliminary hearing and at trial.  Guan had previously complained the criminalist's trial testimony identifying human blood collected from the scene was inconsistent with her preliminary hearing testimony identifying fish blood.  This identifiably false belief was the subject of Guan's competency trial.  (See fn. 2, *ante*.)

morning to ask for a new lawyer, before the sentencing. . . . I find that the request this morning to have a new lawyer to assist you at sentencing is a delaying tactic; therefore, your request is denied."

Contending on appeal that the court abused its discretion by denying his asserted *Marsden* request without holding a hearing, Guan cites authority stating that if a defendant " 'in some manner moves to discharge his current counsel' [citation], . . . the trial court must afford the defendant an opportunity to express the specific reasons why he believes he is not being adequately represented.' " (*People v. Vera* (2004) 122 Cal.App.4th 970, 979.)

But a trial court must conduct a *Marsden* hearing "only when there is at least some clear indication by the defendant, either personally or through counsel, that the defendant wants a substitute attorney." (*People v. Sanchez* (2011) 53 Cal.4th 80, 84.) Here, Guan never explicitly invoked *Marsden*, stated he wished to discharge his attorney, or complained of her representation. Instead, it was Guan's trial attorney who notified the court that Guan had an interest in "hiring" new counsel before sentencing, possibly "his friend," a substitution that Guan represented he "only decided on . . . today." Again demonstrating ambiguity in the term "hire," it was only after further inquiry from the court that Guan stated, "I request that the judge appoint another lawyer for me, to defend me."

A request to continue a sentencing hearing to enable a defendant to hire *private* counsel does not implicate *Marsden*; only a request to appoint new counsel paid by the state to replace current appointed counsel does. (*People v. Courts* (1985) 37 Cal.3d 784, 795, fn. 9.) Thus, the court's denial of the implicit request for a continuance based on a finding that Guan made the request for purposes of delay or to hire his own attorney would be appropriate

14

and well within the court's broad discretion.  (*Courts*, at pp. 790–792, fn. 4; *People v. Jeffers* (1987) 188 Cal.App.3d 840, 850.)

But, even assuming Guan's comments constitute a *Marsden* request, there was no error or associated prejudice.  First, a defendant does not have an "absolute right to more than one appointed attorney."  (*People v. Sanchez*, *supra*, 53 Cal.4th at p. 87.)  While "[t]he California Constitution gives a criminal defendant the right to an attorney who must competently represent the defendant," it "does not give an indigent defendant the right to *select* a court-appointed attorney."  (*People v. Jones* (2004) 33 Cal.4th 234, 244.)

Second, there is "no single, inflexible procedure . . . for conducting a *Marsden* inquiry."  (*People v. Madrid* (1985) 168 Cal.App.3d 14, 18.)  Though the court here did not clear the courtroom to hold a confidential "*Marsden* hearing," doing so is not required.  (*People v. Valdez* (2004) 32 Cal.4th 73, 96 [*Marsden* hearing is " 'not a full-blown adversarial proceeding, but an informal hearing' "].)  What is required is that a court conduct a hearing in which a defendant is able to " 'express the specific reasons why he believe[d] he [was] not being adequately represented by his current counsel.' "  (*People v. Vera*, *supra*, 122 Cal.App.4th at p. 979.)  The trial court gave Guan that opportunity, openly asking, "What do you want me to do?"  The court then listened and responded to Guan's comments concerning the evidence presented at trial, the testimony of the lab technician, and his trial counsel's statement about the jurors' "two chances."

Guan's remarks focused on his belief that the People's evidence was fabricated, which would not constitute grounds for *Marsden* relief unless his attorney was " ' " ' "not providing adequate representation" ' " ' " in that regard or had " ' " ' "become embroiled in such an irreconcilable conflict [with Guan] that ineffective representation [was] likely to result." ' " ' "  (*People v.*

15

*Valdez, supra*, 32 Cal.4th at p. 95.) But neither before the trial court nor on appeal does Guan identify any form of dissatisfaction with the quality of counsel's representation; nor does he contend that he and counsel had become embroiled in irreconcilable conflict.[9]

In any event, even if we held that Guan had invoked *Marsden* and the court erred in the manner in which it conducted the hearing that followed, any error was harmless beyond a reasonable doubt. (*Marsden, supra*, 2 Cal.3d at p. 126 [applying harmless-beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24].) Guan requested new counsel to represent him at sentencing.[10] But where substantial evidence supports the jury's convictions, which are not challenged on appeal, the trial court had no meaningful sentencing discretion that might have been more favorably influenced by a new lawyer.

For first degree murder, the court sentenced Guan to the only possible sentence absent a special circumstance finding: 25 years to life. (§§ 190–190.5.) For elder abuse, the court stayed the entire sentence it imposed.[11]

---

[9] Guan's single, unexplained reference to counsel saying "that the . . . jurors, they have two chances, and now she said they only have one" does not warrant a finding that Guan's relationship with his trial counsel had irreconcilably ruptured, nor did Guan take such a position before the trial court or on appeal. (*People v. Valdez, supra*, 32 Cal.4th at p. 95.)

[10] Guan did not then suggest and does not now claim that he wanted new counsel to file a new trial motion, thus our discussion is limited to any potential impact on sentencing.

[11] The court sentenced Guan to a midterm of three years for the base crime of inflicting unjustifiable physical pain on an elder (§ 368, subd. (b)(1)), a mandatory additional term of seven years based on a finding he proximately caused the death of a person over age 70 (*id.*, subd. (b)(3)(B)), and a further mandatory term of five years on an enhancement for having inflicted great bodily injury (§ 12022.7, subd. (c))—all stayed (§ 654).

(§ 654). It ordered victim restitution of about $7,400 to Sun's granddaughter for funeral-related expenses and her flight to San Francisco to read a victim impact statement, and about $2,100 to Guan's landlord for damage caused by the murder and investigation; the court also retained jurisdiction over a request by the Victim Compensation Board. Guan's counsel unsuccessfully objected to restitution for the cost of Sun's granddaughter's flight. In light of the restitution orders, the court stayed all fines and fees.

Guan identifies no part of his sentence as to which a new lawyer might have persuaded the court to be more lenient. He instead offers a quotation: "Because we do not know what [defendant] might have shown had he received a full hearing on his *Marsden* motion, we cannot say the error was harmless." (*People v. Eastman* (2007) 146 Cal.App.4th 688, 697 (*Eastman*), disapproved on other ground in *Sanchez*, *supra*, 53 Cal.4th at p. 90, fn. 3.) *Eastman* is distinguishable. Eastman, charged with sexual abuse, asked at sentencing to withdraw his plea, claiming his lawyer had colluded with the district attorney to induce him to plead by falsely stating his mother had agreed to testify against him. (*Eastman*, at pp. 691–692.) Eastman's mother wrote a letter to confirm his claim. (*Ibid*.) Rather than hold a *Marsden* hearing, the court appointed a new lawyer to decide if there was a basis to move to withdraw the plea. (*Eastman*, at p. 692.) The lawyer recommended the court find no basis, and it did. (*Id*. at pp. 692–694.) The Fifth Appellate District reversed, holding that the court had improperly delegated to the lawyer its duty under *Marsden*. (*Eastman*, at pp. 696–698.)

In *Eastman*, unlike in this case, the People "[did] not suggest the error can be deemed harmless." (*Eastman*, *supra*, 146 Cal.App.4th at p. 697.) Thereby leading to the court's statement, in dictum, "we do not know what Eastman might have shown had he received a full hearing," so "we cannot say

17

the error was harmless." (*Id.* at p. 698.) The court went on to find prejudice, noting that the claim "presented a colorable basis for withdrawal of his plea." (*Ibid.*)

Taken literally, *Eastman*'s dictum would mean that no inadequacy in a *Marsden* inquiry could ever be harmless, for there will always be some uncertainty as to what a defendant "might have shown." But "*Marsden* does not establish a rule of per se reversible error." (*People v. Washington* (1994) 27 Cal.App.4th 940, 944, citing *People v. Chavez* (1980) 26 Cal.3d 334, 348–349.) *Washington* affirmed a conviction despite the trial court's failure to hold any hearing at all on a *Marsden* request, as the defendant had not shown "either that his *Marsden* motion would have been granted had it been heard, or that a more favorable result would have been achieved had [it] been granted." (*Washington*, at p. 944.) The same is true here.

## IV. The Court Must Correct the Abstracts of Judgment

The parties are in accord that the abstracts of judgment do not reflect the oral sentence, which controls. (§§ 1213, 1213.5; *People v. Mitchell* (2001) 26 Cal.4th 181, 185.) They agree, as do we, that the clerk of court must delete notations labeling the terms on counts 1 and 2 "concurrent" and must add a notation that the court stayed all fees and fines, consistent with the trial court's order.

## DISPOSITION

The judgment of conviction is affirmed, but the matter is remanded for the clerk to prepare amended abstracts of judgment by: (1) removing from page 2, item 12 of the indeterminate-term abstract the words, "Indeterminate Count 1 is concurrent to determinate Count 2"; (2) removing from line 11 of the determinate-term abstract the checkmark in the box next to the words, "This sentence is to run concurrent with (*specify*)" and the notation

18

"Indeterminate Ct. 1"; and (3) noting on the indeterminate-term abstract that the court stayed imposition of the $600 restitution fine (§ 1202.4, subd. (b)), the suspended $600 parole revocation fine (§ 1202.45), the $80 security fee (§1465.8), and the $60 criminal conviction assessment fee (Gov. Code, § 70373).  The court is then to forward certified copies of the amended abstracts to the Department of Corrections and Rehabilitation.

_____
DESAUTELS, J.

We concur:


_____
STEWART, P. J.


_____
MILLER, J.

*People v. Guan* (A168412)